2017 CO 9

**Julio VENALONZO, a/k/a Melvin Manzanares(z), Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**Supreme Court Case No. 11SC878**

Supreme Court of Colorado.

February 6, 2017

Attorneys for Petitioner: Douglas K. Wilson, Public Defender, Tracy C. Renner, Deputy Public Defender, Denver, Colorado

Attorneys for Respondent: Cynthia H. Coffman, Attorney General, Majid Yazdi, Assistant Attorney General, Denver, Colorado

JUSTICE BOATRIGHT delivered the Opinion of the Court.

¶1 Petitioner Julio Venalonzo was convicted of sexual assault on a child, attempted sexual assault on a child, possession of drug paraphernalia, and resisting arrest. Venalonzo appealed, and the court of appeals affirmed in an unpublished opinion. People v. Venalonzo, No. 07CA0882, slip op. at 1, 2011 WL 4837489 (Colo. App. Oct. 13, 2011). Here, we determine whether a forensic interviewer who testified as a lay witness crossed the line between lay and expert testimony. We also address whether the interviewer, the mother of one of the child victims, and an investigating police officer improperly testified that the child victims' accusations against Venalonzo were truthful.[1]

¶2 First, we hold that in determining whether testimony is lay testimony under Colorado Rule of Evidence ("CRE") 701 or expert testimony under CRE 702, the trial

1. We granted certiorari to review the following issues:
 1. Whether the court of appeals erred when it held that the testimony of a child forensic interviewer was lay opinion testimony and therefore was not subject to the admissibility and discovery requirements for expert witnesses.
 2. Whether the court of appeals erred and departed from the longstanding rule against testimony that a witness is telling the truth on a specific occasion by permitting testimony about the credibility of the child accusers in this case.

 We issue this opinion in conjunction with Marsh v. People, 2017 CO 10M, 389 P.3d 100, because it also concerns the proper scope of a forensic interviewer's non-expert testimony. In Marsh, we granted certiorari to review the following issues:
 1. Whether images automatically stored by a computer in its Internet cache are sufficient, without additional evidence of a defendant's awareness of the cache or evidence of a defendant's affirmative conduct such as downloading or saving such images, to establish "knowing possession" under section 18–6–403, C.R.S. (2016).
 2. Whether the court of appeals erred when it held that the testimony of a child forensic interviewer was lay opinion testimony and therefore was not subject to the admissibility and discovery requirements for expert witnesses.

court must look to the basis for the opinion. If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony. If, on the other hand, the witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony. Applying that holding, we conclude that some portions of the interviewer's testimony in this case were admissible as lay opinion but that others were inadmissible expert testimony in the guise of lay opinion. Second, we hold that the interviewer's and the mother's testimony improperly bolstered the credibility of the child victims by creating an impermissible inference that they were telling the truth in this case. However, we hold that Venalonzo opened the door to the investigating officer's statements regarding what children lie about, and therefore the trial court did not abuse its discretion in admitting those statements. Finally, we conclude that the errors in this case warrant reversal. Accordingly, we reverse the court of appeals' judgment and remand this case to that court with instructions to return the case to the trial court for further proceedings consistent with this opinion.[2]

## I. Facts and Procedural History

¶3 Seven-year-old A.M. and eight-year-old C.O. told their respective parents that a man called them over to him while the children were playing in the hallway of their apartment complex and then touched A.M. sexually. Later that day, the two girls both made statements to the police, and, as a result of those statements, police arrested Venalonzo. During the course of the investigation, A.M. and C.O. also spoke with a child forensic interviewer, Ann Smith ("the interviewer"), at Sungate Children's Advocacy Center ("the Advocacy Center"). Both children also testified at trial.

¶4 The children never wavered in their account that a man called them over to him, and A.M. never wavered in her account that a man inappropriately touched her. There

were, however, differences between A.M.'s and C.O.'s accounts. Specific details that varied included what the man who assaulted A.M. was wearing, what he was doing with his hands before he touched A.M., where he was standing, what he said to the children, how and from where he entered the building, to whom the children first told their story, and whether C.O. was present when the man assaulted A.M. Each child's own account also changed over time on these details. Moreover, A.M.'s story changed regarding where the man had touched her, including whether it was over or under her clothing, and what he did before and after.

¶5 Before trial, Venalonzo requested a summary of any expert or "specialized knowledge" testimony. The People maintained that they would not present any expert testimony, so the trial court denied Venalonzo's request. Prior to and during trial, Venalonzo objected to portions of the interviewer's testimony that he asserted were expert testimony. The trial court deferred its ruling on the objections that Venalonzo made prior to trial until it heard the interviewer's testimony. At trial, the interviewer began by testifying about the interviewing process that she used, her training, and her experience interviewing children. Venalonzo objected to this background, arguing that it called for expert testimony. The trial court called a bench conference, during which Venalonzo's defense counsel renewed his objection to the interviewer's anticipated testimony about A.M.'s and C.O.'s behavior during the interview. He argued that relating and interpreting the demeanor and language of the children during the forensic interviews—as well as discussing whether the children's behavior was common or uncommon as compared with other victims of sexual abuse—was expert testimony and that such testimony amounted to statements that the children were telling the truth in this case.

¶6 After the bench conference, the court declined to require the People to qualify the interviewer as an expert and ruled that she

2. Although we reverse the court of appeals' judgment based on Venalonzo's first argument—that the trial court reversibly erred in admitting portions of the forensic interviewer's testimony—we

address Venalonzo's remaining arguments on appeal because the issues are likely to arise on remand.

would be allowed to answer the People's questions as long as she did not comment on the children's veracity. The court did, however, allow the interviewer to testify about whether A.M.'s and C.O.'s behavior during their interviews was common among children whom she previously interviewed.

¶7 After this ruling, the People continued their direct examination. Venalonzo then specifically objected that the People were attempting to elicit expert testimony that bolstered A.M.'s and C.O.'s credibility when the People asked the interviewer to provide the following information: (1) how many children the interviewer had forensically interviewed with the Advocacy Center; (2) how many children the interviewer ultimately determined had not been abused; (3) how many times the interviewer had testified in a court of law; (4) whether children commonly tell other children about abuse before telling adults; (5) whether children typically say different things to the interviewer than they do to responding officers or Department of Human Services workers, or when testifying at trial; (6) whether specific details on which the children's stories differed—such as whether C.O. was present when A.M. was assaulted—were core or peripheral; (7) what "reproduction"—whereby child victims demonstrate inappropriate touching on their own bodies—is; (8) how A.M. "reproduced" the event in question; (9) why forensic interviewers look for signs of reproduction; and (10) whether forensic interviews sometimes lead to charges being dropped. The trial court allowed the interviewer to answer all of these questions except for two: the question regarding the gestures A.M. used to reproduce the event, ruling that this evidence was cumulative because the jury would witness A.M.'s actions when it watched the videotaped interview, and the question regarding why interviewers look for signs of reproduction, ruling that this called for expert testimony.

¶8 Venalonzo also objected to the testimony from two other witnesses: A.M.'s mother ("Mother") and the investigating police officer. The People called Mother to testify about A.M.'s outcry. During her testimony, she said that A.M. had never accused anyone else of touching her inappropriately and that

she did not know of any reason for A.M. to make up such a story, stating further, "She wouldn't unless it was true." To support this position, the prosecutor asked her to testify about the signs that reveal when her daughter is lying. Mother did so, and she testified that A.M. had exhibited none of those signs when reporting the alleged assault that gave rise to this case. Finally, she stated that A.M.'s mind "wouldn't go to [the] level" of falsely accusing someone of sexual assault.

¶9 The investigating police officer also testified. On direct examination, he told the jury about his interviews with A.M. and C.O. on the day of the incident. During cross-examination, the officer agreed with defense counsel that, based on his prior experience as a school teacher, young children were suggestible and sometimes made up stories or could be talked into doing so by other children. On redirect, the prosecutor asked the officer to clarify what types of stories children tended to make up. Venalonzo objected, asserting that the testimony would constitute improper bolstering, but the trial court ruled that Venalonzo had opened the door to the question. The officer responded that children make up stories about "trivial things" but that he had never experienced children of the victim's age "making things up ... about something of a very serious nature."

¶10 Ultimately, the jury returned guilty verdicts on both the sexual assault and the attempted sexual assault charges, and the trial court sentenced Venalonzo to an indeterminate prison sentence of three years to life for sexual assault on a child and a consecutive two-year prison sentence for attempted sexual assault on a child. Venalonzo appealed, arguing that the trial court erred when it admitted the interviewer's testimony because (1) the People had not endorsed her as an expert witness and (2) her testimony amounted to an opinion that A.M. and C.O. were telling the truth. Additionally, Venalonzo argued that the trial court erred when it allowed Mother and the investigating police officer to offer what amounted to testimony that A.M. and C.O. were telling the truth.

¶11 The court of appeals affirmed the trial court's rulings on all issues. The court held that the interviewer's testimony about her

qualifications and training was basic information within the scope of lay opinion testimony. Venalonzo, slip op. at 9–10. Relying on People v. Tillery, 231 P.3d 36 (Colo. App. 2009), the court also noted that the interviewer's testimony comparing the children's interviews in this case to typical child victim interviews "was derived from her 'years of observing such interviews,' not from specialized training." Venalonzo, slip op. at 10 (quoting Tillery, 231 P.3d at 42). The court of appeals then held that "the interviewer gave no opinion on whether A.M. and C.O. told the truth in their interviews," and it stated that "[t]he likelihood that the jury could infer from the interviewer's testimony that the girls' accounts were credible does not mean the interviewer expressed that assessment." Id. at 15. Rather, the court held that the interviewer's testimony was admissible because it "spoke to the general characteristics of child victim interviews, which helped the jury assess the girls' credibility." Id.

¶12 The court of appeals concluded further that the interviewer's testimony was helpful because "it informed the jury that the inconsistencies in children's relation of events are common." Id. It noted that Venalonzo had opened the door to this testimony in his opening statement by suggesting that the children's inconsistent stories meant that they were lying, and that the interviewer's testimony properly responded to that attack on their credibility. Id. Finally, it held that the interviewer properly testified that forensic interviews sometimes result in exonerating suspects because the interviewer was responding to Venalonzo's implication during cross-examination that the interviewer and the organization she worked for were biased in favor of law enforcement. Id. at 16.

¶13 The court of appeals also rejected Venalonzo's arguments regarding Mother and the investigating police officer. As to Mother, it held that her testimony went to A.M.'s sophistication and general characteristics for truthfulness. In doing so, the court of appeals stated that trial courts "may admit opinion testimony about the general credibility of a child sex assault victim if it will 'assist the jury in evaluating the credibility of the testifying child [victim]' and if it relates to general characteristics for truthfulness." Id. at 11–12 (quoting People v. Woertman, 786 P.2d 443, 447 (Colo. App. 1989), rev'd on other grounds, 804 P.2d 188 (Colo. 1991)). It also noted that Mother never explicitly testified that A.M. was telling the truth and that, in any event, Venalonzo had opened the door by implying on cross-examination that A.M. had been following C.O.'s lead when she made up the allegations. As to the officer, it held that his testimony regarding what types of things children make up stories about was proper. According to the court of appeals, Venalonzo opened the door to this testimony, and it was relevant because it "helped the jury 'make a more informed decision in evaluating the credibility of a testifying child.'" Id. at 14 (quoting People v. Koon, 713 P.2d 410, 411 (Colo. App. 1985)). The court of appeals rejected all of Venalonzo's remaining arguments.

¶14 We granted Venalonzo's petition for certiorari. Ultimately, we reverse the convictions.

## II. Standard of Review

¶15 We review a trial court's evidentiary decisions for an abuse of discretion. People v. Stewart, 55 P.3d 107, 122 (Colo. 2002). A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. Id.

## III. Analysis

¶16 We first consider Venalonzo's contention that the trial court erred in admitting the interviewer's testimony without requiring that the People endorse her as an expert witness. We hold that in determining whether testimony is lay testimony under CRE 701 or expert testimony under CRE 702, the trial court must look to the basis for the opinion. If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony. If, on the other hand, the witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony. Applying that holding, we conclude that some portions of the interviewer's testimony in this

case were admissible as lay opinion but that others were inadmissible expert testimony in the guise of lay opinion. Second, we consider Venalonzo's argument that the interviewer's, Mother's, and the investigating officer's testimony violated the rule against testimony that a witness is telling the truth in a specific instance. We hold that the interviewer's and Mother's testimony improperly bolstered A.M.'s and C.O.'s credibility by creating an impermissible inference that they were telling the truth in this case. However, we hold that Venalonzo opened the door to the investigating officer's statements regarding what children lie about, and therefore the trial court did not abuse its discretion in admitting those statements. Finally, we conclude that the errors in this case warrant reversal.

## A. Expert Testimony

### 1. Law

¶17 Whether a witness's testimony is lay or expert depends on the facts and surrounding circumstances of the case and "requires a case-by-case analysis of both the witness and the witness's opinion." United States v. Smith, 591 F.3d 974, 982–83 (8th Cir. 2010). To make this determination, we must start with the Colorado Rules of Evidence.

¶18 Together, CRE 701 and 702 distinguish lay testimony from expert testimony. CRE 701 defines the scope of lay witness opinion testimony. It provides that lay witness testimony in the form of opinions or inferences must be "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [CRE] 702." CRE 702, on the other hand, concerns the admissibility of expert testimony. Under this rule, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." CRE 702.

¶19 Previously, we considered this distinction between lay and expert testimony in Stewart. There, a police officer testified about his training in investigating and reconstructing traffic accidents, his observations and reconstruction of the crime scene at issue in the case, and the inferences he drew from the reconstruction. Stewart, 55 P.3d at 122–23. We held that the officer's testimony about his observations of the crime scene and his investigation of the incident were admissible as lay opinion testimony. Id. at 124. His "deductions about ... the vehicle's direction, position, and speed" during the accident, however, required specialized training and knowledge and were therefore expert testimony. Id. Accordingly, we concluded that the trial court abused its discretion in admitting the investigating police officer's accident reconstruction testimony without requiring that he be qualified as an expert. Id.

¶20 Similarly, in People v. Veren, 140 P.3d 131, 139–40 (Colo. App. 2005), the court of appeals considered whether a police officer's testimony that he suspected a defendant of manufacturing methamphetamine solely because the defendant possessed a large amount of Sudafed was expert testimony. The court held that this was improper expert testimony in the guise of lay opinion because it required specialized knowledge. Id. at 139. The court of appeals reasoned that while ordinary people might know that Sudafed contains an ingredient that can be used to manufacture methamphetamine, they probably would not know how much Sudafed would be required for this purpose. Id. The court of appeals noted that "the only persons having such knowledge would be those who are either actually involved in the sale of illegal substances, or those who are involved in law enforcement's effort to curb such sales." Id. (quoting State v. Rothlisberger, 95 P.3d 1193, 1200 n.5 (Utah App. 2004)). Therefore, the Veren court held that the officer's testimony was expert testimony because, without specialized knowledge and training, the officer would not have been able to infer based on the facts that he observed that the defendant intended to manufacture and sell methamphetamine. Id.

¶21 While this court has addressed the line between lay and expert testimony in the context of police officers, we have not done so for forensic interviewers. Thus, case law from other jurisdictions is informative. State v. Gonzalez, 150 N.H. 74, 834 A.2d 354 (2003), is particularly relevant to our inquiry here. In Gonzalez, the New Hampshire Supreme Court addressed a social worker's testimony that victim recantations or denials are not unusual in sexual abuse cases. Id. at 358. The prosecutor first asked the social worker whether she had received any training or education about sexual abuse allegations, and then asked whether recantations are unusual in sexual abuse cases. Id. at 356. The social worker responded that recantations are not unusual. Id. The court held that the witness's statements concerning "a child's delayed disclosure of abuse, inconsistent statements about abuse, and recantation of statements about abuse" constituted expert testimony because those behaviors "may be puzzling or appear counterintuitive to lay observers when they consider the suffering endured by a child who is continually being abused." Id. at 358 (quoting State v. Cressey, 137 N.H. 402, 628 A.2d 696, 702 (1993)). In other words, the testimony was improper because an ordinary person would not know that children commonly delay disclosing abuse.

¶22 As these cases illustrate, the critical factor in distinguishing between lay and expert testimony is the basis for the witness's opinion. That is, the proper inquiry is not whether a witness draws on her personal experiences to inform her testimony; all witnesses rely on their personal experience when testifying. Rather, it is the nature of the experiences that could form the opinion's basis that determines whether the testimony is lay or expert opinion. See Stewart, 55 P.3d at 123; see also People v. Souva, 141 P.3d 845, 849 (Colo. App. 2005) (concluding that an eye witness who happens to be a certified addictions counselor may offer lay testimony about whether the defendant appeared to be under the influence of drugs at the time she observed him). To determine whether the testimony in question is testimony that an ordinary person could give, "courts consider whether ordinary citizens can be expected to know certain information or to have had certain experiences." People v. Rincon, 140 P.3d 976, 982 (Colo. App. 2005) (citing United States v. McDonald, 933 F.2d 1519, 1522 (10th Cir. 1991)). Expert testimony, by contrast, is that which goes beyond the realm of common experience and requires experience, skills, or knowledge that the ordinary person would not have. See James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1214 (10th Cir. 2011).

¶23 Hence, we hold that in determining whether testimony is lay testimony under CRE 701 or expert testimony under CRE 702, the trial court must look to the basis for the opinion. If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony. If, on the other hand, the witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony.

¶24 This distinction can be a difficult one, and because it requires trial courts to engage in fact-specific analyses in the course of trial, we review their conclusions for an abuse of discretion.

¶25 With this understanding in mind, we now turn to the trial court's decision to admit the interviewer's testimony as lay opinion in this case.

### 2. Application

¶26 Here, Venalonzo challenges specific portions of the interviewer's testimony. We treat these challenges separately because we conclude that some, but not all, of her testimony exceeded the scope of CRE 701.

¶27 First, we address Venalonzo's argument that the interviewer's statements about her training, experience, and techniques conducting forensic interviews constituted expert testimony.[3] The interviewer's

---

**3.** At trial, Venalonzo also objected that the interviewer's testimony about her training and experience was irrelevant. The trial court overruled the objection, deciding that it would allow the interviewer to offer testimony about how the conduct of the child victims in this case compared to that

testimony describing her professional background, including the number of interviews she has conducted and the number of times she has testified in court, is not expert testimony because any ordinary person is capable of describing her own credentials. The interviewer also described how she conducts an interview with a child victim, including that she builds rapport with the child, tests the child's memory, directs the child to answer questions honestly, and usually asks open-ended, not leading, questions. This description of basic interview protocol did not amount to expert testimony, either. While an ordinary person may not be able to articulate a specific protocol for conducting interviews, she would know that in order to obtain accurate information from a child, it is important to make the child feel comfortable, evaluate whether the child remembers the events in question, and make sure the child understands the importance of the truth. As for the distinction between leading and non-leading questions, the terms themselves may not be familiar to a lay person, but the concepts certainly are. The ordinary person could be expected to understand that asking a question, especially of a child, that in itself suggests the answer would yield a less reliable response. Significantly, in testifying about her professional background, the interviewer did not draw any inferences about the victim's behavior in this case, and she did not describe her interview techniques in detailed or technical terms that would have been outside the understanding of an ordinary person. We conclude that this general description of the protocol that the interviewer uses when interviewing child victims did not require specialized knowledge, and thus the trial court did not abuse its discretion in admitting it.

¶28 Next, Venalonzo argues that the interviewer's testimony that children are not very good at understanding physical measurements, that they often use generalities when speaking, and that they often reveal secrets to other children before they tell adults was expert testimony. We disagree. That the interviewer recognized this behavior because of her years of experience interviewing child sex assault victims does not mean that her observations were expert testimony. The ordinary person has spent time with children and could reasonably be expected to know that they are not as accurate or perceptive as adults. Similarly, an ordinary person could be expected to know that children are more apt to share information with their peers than with adults, especially if they are unsure whether they may have done something wrong and fear being punished. Because an ordinary person who interacts with children can recognize these behaviors without additional training or specialized experience, this information is lay opinion testimony within the scope of CRE 701.

¶29 Although the aforementioned parts of the interviewer's testimony were not expert testimony, other portions that Venalonzo challenges fall outside the scope of CRE 701 because they include conclusions that relied on the interviewer's specialized experience. In particular, the interviewer testified as an expert when she described the significance of the children's behavior during the forensic interviews. This included the interviewer's reference to "reproduction"—the habit of children to gesture with their hands to demonstrate where on their bodies they were touched—and her statement that A.M. had engaged in this behavior in this case. She used her specialized knowledge to answer the prosecutor's question about what a child's reproduction means to a forensic investigation. She explained that reproduction is "[w]hen [child victims] actually demonstrate on their own body what occurred to them, they do that without my prompting, try to describe some touching that happened to them. They physically demonstrate that on themselves." The interviewer could not have offered this testimony without her specialized experience conducting forensic interviews. While this testimony was brief, the interviewer's explanation attached significance to the victims' behavior that an ordinary person would not recognize, and its admission as lay testimony was thus an abuse of the trial court's discretion.

of other children she had interviewed, making the interviewer's background information relevant. The issue of relevance is not before us, and we do not address it here.

¶30 Similarly, the interviewer's discussion of "core versus peripheral" details also included opinion based on specialized knowledge, particularly when she discussed the relative importance of each type of detail in determining the truth of an allegation and categorized several of the details to which the children testified as either core or peripheral.[4] The significance of these differences is not common knowledge, nor would the ordinary person recognize their importance based on her life experience. Assigning weight to "core" and "peripheral" details is technical and requires training, skilled observation, and specialized knowledge. An ordinary person could not be expected to properly characterize parts of a child's story as a core or peripheral fact so as to determine that story's truth. While anyone who has made a credibility determination knows that the truth is found in the details of the story, giving special weight to "core details" is different. Some people may recognize the distinction based on their personal interactions with children, but the ordinary person would probably not know that the core details of a child's account will remain the same even if the child forgets or confuses the peripheral details. Here, the interviewer testified that she learned about the significance of core versus peripheral details from her extensive training in forensic interviewing and from her experience treating child sex assault victims. Thus, making this distinction constituted expert testimony that was "based on ... specialized knowledge within the scope of Rule 702," meaning the trial court abused its

discretion in admitting it as lay testimony. See CRE 701(c).

¶31 Having determined that it was error to permit the forensic interviewer to offer expert testimony in the guise of lay opinion, we now address whether three witnesses' testimony improperly bolstered A.M.'s and C.O.'s credibility.

## B. Bolstering Testimony

### 1. Law

¶32 This court has held that witnesses are prohibited from testifying that another witness is telling the truth on a particular occasion. People v. Wittrein, 221 P.3d 1076, 1081 (Colo. 2009) (citing CRE 608(a)); People v. Eppens, 979 P.2d 14, 17 (Colo. 1999). This rule applies to both direct and indirect implications of a child's truthfulness. See Wittrein, 221 P.3d at 1082 (citing People v. Snook, 745 P.2d 647, 648 (Colo. 1987), for the proposition that a social worker's testimony that children tend not to fabricate stories of sexual abuse was inadmissible because it was tantamount to testimony that the child victim was telling the truth in that case).[5] The danger in admitting such testimony lies in the possibility that it will improperly invade the province of the fact-finder. See People v. Newbrough, 803 P.2d 155, 163 (Colo. 1990).

¶33 Testimony that another witness is credible is especially problematic where the outcome of the case turns on that witness's credibility. This often occurs in child sex assault cases. See, e.g., Pennsylvania v. Rit-

4. The interviewer explained core details, stating that they are "the actual substance of the allegation or what the child says is the ... violation that happened to them." She went on to say that peripheral details are things like what the child was wearing and what other people were doing. She testified that consistency in core details is more important than in peripheral details in determining truthfulness:

> Core details are the major facts of the case or things that happened. I generally expect those things to stay consistent, the peripheral details I see the most change in. Because, generally, those questions aren't asked of the child, but I generally anticipate those core details about the real thing that took place or the thing that took place to stay consistent.

In addition, the interviewer testified that "[i]f there is great distance [between when the first statement was taken at the Advocacy Center and

the time of trial], memory fades about those smaller details and they are just not as important for the child to remember. I expect those basic core details to be the same." Immediately after this line of questioning, she affirmed that A.M. and C.O. made inconsistent statements—about what toys they were playing with, where the man who beckoned to them was standing when he did so, and whether C.O. was in the room when the man touched A.M.—and she stated that these were not core details.

5. The parties in this case did not argue that we should depart from this case law, and the viability of Snook and the cases that followed it is not before us today. See Sanchez v. State, 730 P.2d 328, 333 (Colo. 1986) (error to consider an issue that neither party raised in their briefs).

chie, 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) ("Child abuse is one of the most difficult crimes to detect and prosecute, in large part because there often are no witnesses except the victim."). Children may delay reporting sexual abuse, making the collection of physical evidence difficult or impossible. See People v. Fasy, 829 P.2d 1314, 1317 (Colo. 1992) (discussing expert testimony that child victims delay reporting sexual assault). In such instances, the child's testimony is likely the most significant evidence, and the case turns on whether the fact-finder finds the alleged victim credible. See, e.g., State v. Marrington, 335 Or. 555, 73 P.3d 911, 917 (2003) (holding that the erroneous admission of expert testimony was reversible because the case "involved a swearing contest" in which the victim claimed that the defendant touched her, and he testified in his own defense that he did not). Thus, courts must be particularly mindful of testimony that a child victim is telling the truth when that child's testimony is "the focal issue in the case." Snook, 745 P.2d at 649.

¶34 With these principles in mind, we now assess whether the interviewer's, Mother's, and the officer's testimony violated the rule against testimony that another witness is telling the truth.

## 2. Forensic Interviewer

¶35 As discussed above, the interviewer testified about the two girls' interviews and compared their behavior to that of other child sex assault victims. Specifically, she stated that many of the children's behaviors were common to other child sex assault victims she had interviewed and testified that some forensic interviews have led the People to drop charges against suspects. We conclude that the interviewer's testimony violated CRE 608(a) because it improperly bolstered the children's credibility and led to the impermissible inference that the children were telling the truth about the incident.

¶36 First, the only purpose for the interviewer's testimony comparing A.M.'s and C.O.'s behavior to that of other child sex assault victims was to bolster the children's credibility. See Snook, 745 P.2d at 648–49 (holding that "the jury's only conceivable use

of" testimony that children tend not to fabricate stories of sexual abuse and that they often reproduce their experience when reporting it "would be as support for the complainant's truthful character"). Admitting this evidence did not make any other fact at issue more or less probable. The testimony was not necessary for the People to lay a foundation for admitting the videotaped forensic interviews. Cf. CRE 901(b)(1) (providing that "[t]estimony that a matter is what it is claimed to be" is sufficient to lay foundation for admissibility). Once the interviewer began comparing A.M. and C.O. to other child sex assault victims—stating that children who had been sexually assaulted commonly gave conflicting details—her testimony had no proper purpose. Instead, the People offered it to show that, despite their inconsistent accounts of the assault, A.M. and C.O. were telling the truth. We conclude that the trial court abused its discretion in admitting this testimony.

¶37 Venalonzo also objected to the interviewer's statement on redirect examination that forensic interviews have led the People to drop charges against some suspects. He argued that this testimony implied that A.M. and C.O. were telling the truth because, after the interviewer's forensic interviews in this case, the People moved forward with their charges against Venalonzo. The People counter that this testimony was proper because they elicited the statement in response to Venalonzo's implication that the interviewer was biased. We agree with Venalonzo. The prosecutor first brought up the issue of bias on his direct examination of the interviewer. Specifically, the prosecutor asked, "[A]re you an agent for the police?" to which the interviewer responded that she was not. Subsequently, during cross-examination, defense counsel pursued this line of questioning by asking which organizations hire the Advocacy Center to conduct forensic interviews and about the Advocacy Center's relationship with various state governmental and legal entities. Although these questions implied bias, they did not open the door to the interviewer's testimony that previous, unrelated interviews resulted in dropped charges. The People sufficiently responded to

Venalonzo's implication by eliciting testimony from the interviewer that she was not biased when she interviewed A.M. and C.O., that no district attorneys served on the Advocacy Center's board or influenced its policies, and that forensic interviewers try to prevent suggestibility to protect the integrity of the case and the defendant's interest. The testimony about previous interviews resulting in dropped charges implied that the children were telling the truth about Venalonzo's acts because, here, the People charged Venalonzo with sexual assault. Thus, we conclude that the trial court abused its discretion in admitting it.[6]

¶38 We now address the portions of Mother's testimony that Venalonzo challenges.

### 3. Mother

 ¶39 Mother testified that A.M. did not display any signs that she was lying when she reported the incident, that A.M. was not sophisticated enough to make up a story about the sexual assault, and that A.M. had no reason to accuse Venalonzo unless the incident had actually occurred. We conclude that Mother's testimony amounted to testimony that A.M. was telling the truth about the sexual assault.

¶40 Mother's statements were similar to those that we held were improper in Snook and Wittrein. The expert social worker in Snook testified that "children tend not to fabricate stories of sexual abuse and in giving reports tend to reproduce their experiences." 745 P.2d at 648. She further testified that, "in order to make these things up, there has to be a basis for that experience." Id. We held that the testimony was inadmissible under CRE 608 because it was testimony "that [the child victim] is almost certainly telling the truth." Id. at 648–49. Similarly, in Wittrein, a child psychiatrist testified, "It's hard for me to imagine that an eight-year-old child would

be able to put together . . . a plan [to portray herself as a victim]." 221 P.3d at 1081. We characterized this statement as an improper "generalization about whether children have the sophistication to fabricate allegations of sexual abuse." Id. at 1082. Thus, we held that the testimony was inadmissible. Id.

¶41 Here, although Mother did not directly state that her daughter was telling the truth, her statements communicated this belief. As in Snook and Wittrein, Mother's testimony on this issue served no other purpose than to bolster A.M.'s credibility. By testifying that her daughter was not sophisticated enough to fabricate her allegations against Venalonzo, that she had no reason to make up the story, and that she would not make this accusation unless it were true, Mother expressed her belief that A.M. was telling the truth in this instance. Therefore, Mother's testimony violated CRE 608(a), and the trial court abused its discretion by allowing it.

¶42 The People assert that Venalonzo opened the door to this testimony by implying that A.M. made up her story at C.O.'s suggestion. Even assuming, without deciding, that defense counsel's questions attacked A.M.'s character for truthfulness, Mother's testimony addressed A.M.'s truthfulness in this specific instance as opposed to her general character for truthfulness. When questioning Mother, the prosecutor stated, "you said that she wouldn't accuse somebody of this," and asked whether "her mind wasn't sophisticated enough to come up with this?" (Emphasis added). He also asked Mother whether she knew of any reason A.M. would say that Venalonzo had touched her. The prosecutor's questions thus elicited Mother's comments on A.M.'s veracity in this case, specifically regarding Venalonzo. For this reason, even if Venalonzo opened the door to testimony about A.M.'s general character for truthfulness, Mother's testimony went be-

---

6. On appeal, Venalonzo also argues that the interviewer's testimony discussing A.M.'s "reproduction" of the alleged assault improperly bolstered A.M.'s credibility. However, Venalonzo did not object to the bolstering effect of this testimony at trial, so we apply plain error review. See Hagos v. People, 2012 CO 63, ¶ 14, 288 P.3d 116, 120. An error is plain only when it is obvious and substantial. Id. In her explanation of

reproduction, the interviewer subtly suggested that A.M. and C.O. were being truthful by using language like "actually demonstrate" and "what occurred to them." While the interviewer may have implied that she believed that A.M. and C.O. were truthful in their reproduction, it did not so obviously constitute improper bolstering as to amount to plain error.

yond the scope of admissible testimony under CRE 608(a).

¶43 Next, we consider the investigating officer's testimony.

### 4. The Investigating Officer

¶44 Venalonzo argues that the trial court erred in permitting the investigating police officer to testify that, in his experience as a school teacher, children only make up trivial stories, not serious accusations.[7] Normally, this statement would constitute improper testimony that the children were telling the truth. See Snook, 745 P.2d at 648–49; Wittrein, 221 P.3d at 1081–82. In this case, however, Venalonzo had previously questioned the officer about this exact issue when he asked whether, in the officer's experience, kids make things up. By doing so he opened the door for further questioning on this matter. The People were entitled to follow defense counsel's question about kids making things up with a question regarding what types of things they would make up. "The concept of 'opening the door' represents an effort by courts to prevent one party in a criminal trial from gaining and maintaining an unfair advantage by the selective presentation of facts that, without being elaborated or placed in context, create an incorrect or misleading impression." Golob v. People, 180 P.3d 1006, 1012 (Colo. 2008). The officer's testimony on redirect examination placed his answer on cross-examination in context and did not exceed the scope of cross-examination. Therefore, because Venalonzo opened the door to the officer's statements, the trial court did not err in admitting this testimony.

¶45 In sum, although the trial court did not err in admitting the investigating officer's statements because Venalonzo opened the door to this testimony, it did abuse its discretion in admitting portions of the interviewer's and Mother's testimony because they violat-

ed the rule against testimony that another witness was telling the truth.

¶46 Having reached these conclusions, we now turn to the question of whether the trial court's errors in admitting the interviewer's and Mother's testimony merit reversal.

### C. Reversible Error

¶47 Venalonzo contends that the trial court's admission of the interviewer's and Mother's improper testimony prejudiced him because their testimony vouched for the two child witnesses' credibility—which was a central issue in this case. We agree and therefore conclude that the trial court's error in admitting the testimony was not harmless.

¶48 We review preserved, nonconstitutional errors for harmless error. Hagos v. People, 2012 CO 63, ¶ 12, 288 P.3d 116, 119.[8] Under harmless error review, we reverse only if the error "affects the substantial rights of the parties." Id. An error affects a party's substantial rights if it "substantially influenced the verdict or affected the fairness of the trial proceedings." Id. (quoting Tevlin v. People, 715 P.2d 338, 342 (Colo. 1986)).

¶49 We considered the impact of a similar error in Snook. In that case, we held that the trial court's erroneous admission of a social worker's expert testimony that "children tend not to fabricate stories of sexual abuse" required reversal of the defendant's conviction. Snook, 745 P.2d at 648–49. We reasoned that the victim's credibility was the focal issue in the case, and because the social worker's testimony "directly supported [the victim's] credibility, it may have been the deciding factor in the jury's decision that [the victim's] version was correct." Id. at 649. Like in Snook, here both the interviewer's and Mother's improper testimony substantially impacted Venalonzo's right to a fair trial.

---

7. The officer also stated that there was nothing about how fast C.O. was talking that made him think C.O. was being untruthful. Because the admissibility of this statement was not raised on appeal, we do not address it.

8. Because Venalonzo objected to the interviewer's testimony at trial, he preserved this issue on appeal, and we apply harmless error review. See Hagos, ¶ 12, 288 P.3d at 119. Venalonzo con- tends that we should apply constitutional harmless error review to the trial court's erroneous decision to permit the interviewer to testify as a lay witness because it interfered with his constitutional right to effectively cross-examine her. We need not resolve this issue, however, because the trial court's error is reversible under harmless error review.

¶50 As to the interviewer's testimony, the prosecution's failure to disclose the interviewer as an expert witness prejudiced Venalonzo because the interviewer's specialized experience, combined with her use of technical terms, imbued her testimony with an air of expertise and may have led the jury to credit her assessment of the children's credibility over other evidence in the case. If Venalonzo had had the benefit of pretrial disclosure of the interviewer's expert testimony and the bases for her opinions, then he would have had "the opportunity to evaluate the testimony in advance of trial or to obtain his own expert witness." Veren, 140 P.3d at 140; accord Todd v. Bear Valley Vill. Apartments, 980 P.2d 973, 979 (Colo. 1999) (discussing similar prejudice in civil cases). Instead, when the interviewer offered an expert opinion on the most crucial evidence in the case, Venalonzo was without recourse to counter that testimony with his own expert witness. Therefore, permitting the interviewer to offer her expert opinion caused Venalonzo to suffer the prejudice that the rules governing expert witnesses seek to prevent. Furthermore, A.M.'s and C.O.'s testimony was the focal point of the case, since no other witnesses were present during the alleged assault and there was no physical evidence. Because of the significance of A.M.'s and C.O.'s testimony, the interviewer's improper expert testimony that directly supported their credibility by justifying inconsistencies in their testimony caused significant unfair prejudice. See Veren, 140 P.3d at 140.

¶51 Similarly, Mother's testimony directly communicated to the jury that she believed A.M. was telling the truth. The prosecutor even pointed out in his closing argument that Mother is the one person who knows A.M. best, thus furthering the impact of her improper testimony.

¶52 In sum, we cannot say that the interviewer's and Mother's improper testimony did not substantially influence the jury's verdict. Therefore, the trial court's errors in permitting the interviewer to offer improper expert testimony and in permitting the interviewer and Mother to offer testimony that improperly bolstered the children's credibili-

ty were not harmless, and they require us to reverse Venalonzo's convictions. See id.

## IV. Conclusion

¶53 We hold that in determining whether testimony is lay testimony under CRE 701 or expert testimony under CRE 702, the trial court must look to the basis for the opinion. If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony. If, on the other hand, the witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony. Applying that holding, we conclude that some portions of the interviewer's testimony in this case were admissible as lay opinion but that others were inadmissible expert testimony in the guise of lay opinion. We further hold that the interviewer's and Mother's testimony improperly bolstered A.M.'s and C.O.'s credibility by creating an impermissible inference that they were telling the truth in this case. However, we hold that Venalonzo opened the door to the investigating officer's statements regarding what children lie about, and therefore the trial court did not abuse its discretion in admitting those statements. Finally, we conclude that the errors in this case warrant reversal. Accordingly, we reverse the court of appeals' judgment and remand this case to that court with instructions to return the case to the trial court for further proceedings consistent with this opinion.

JUSTICE COATS concurs in the judgment, and JUSTICE EID joins in the concurrence in the judgment.

JUSTICE COATS, concurring in the judgment.

¶54 Although I would also reverse the judgment of the court of appeals and the defendant's sexual-assault-related convictions, I fundamentally disagree not only with the majority's treatment of rules 608(a), 701, and 702 of the Colorado Rules of Evidence but, more generally, with its approach to ascribing meaning to those rules in the first place. Quite apart from the propriety of disregarding the texts of the individual rules

themselves, I think the majority's recasting of their more precise, in its own less precise and circular, terms can only create more problems in application than it could possibly solve. Moreover, I object to the majority's analysis both because I believe it perpetuates (without meaningful reflection) questionable characterizations of these particular rules from our earliest attempts to apply the new evidentiary code, and because I believe it substantially misconceives the underlying purpose and design of the code's treatment of opinion testimony. I therefore write to offer a counterview.

¶55 Initially, I fault the majority for failing to make any serious effort, or perhaps even recognize its obligation, to construe the pertinent language of the rules. Since 1980, the law of evidence in this jurisdiction has been governed by an integrated body of rules, adopted by this court, subject to the same principles of interpretation that govern our interpretation of statutes. While the majority at times refers to specific rules and purports to apply them, it largely ignores both their specific language and established canons of interpretation, in favor of conclusorily prescribing their meaning in terms it apparently finds more palatable.

¶56 Notwithstanding our having explicitly addressed, not fifteen years ago, the differences between testimony admissible as lay opinion, pursuant to CRE 701, and testimony admissible as expert opinion, pursuant to CRE 702, and our having identified the considerations that serve to bar the admission of expert opinion under the guise of lay opinion, see People v. Stewart, 55 P.3d 107, 121–124 (Colo. 2002), the majority finds the fact that our opinion in that case did not address the testimony of "forensic interviewers" in particular to be sufficient justification for departing from our own precedent, in favor of adopting terms and distinctions made by a foreign jurisdiction, in reliance on its own prior case law. See maj. op. ¶ 21 (adopting the holding of State v. Gonzalez, 150 N.H. 74, 834 A.2d 354 (2003), which in turn adopted the reasoning of State v. Cressey, 137 N.H. 402, 628 A.2d 696 (1993), neither of which purports to rest its holding on the actual language of its own similar rule of evidence).

And with regard to testimony touching upon the credibility of witnesses, while the majority purports to rely on our prior interpretations of CRE 608(a), I believe it draws the wrong lesson from those prior interpretations and effectively creates a broad and unworkable rule concerning "bolstering," or vouching for the truthfulness of particular testimony.

¶57 Notwithstanding the majority's suggestion that it is the nature of the witness in this case as a "forensic interviewer" that justifies its reconsideration of the difference between lay and expert opinion, it makes little attempt to relate opinion testimony generally to a forensic interviewer's opinion focusing on witness credibility, treating them instead as alternate rationales for exclusion. Rather than approach these rules as an integrated scheme designed to present the fact finder only with evidence that is sufficiently probative of material issues and afford that fact finder some reasonable basis for evaluating the reliability of the evidence so presented, the majority approaches the various rules as if they were unrelated, segregating the testimonial evidence at issue into discrete units and considering each separately, without regard for their broader impact. While I can appreciate the need, given the ebb and flow of testimony and objections at trial, to articulate standards of admissibility in terms that can realistically be applied by ruling courts, I do not believe trial courts are greatly aided in making what are necessarily interrelated and discretionary decisions concerning admissibility by providing them with a series of mechanical rules, lacking any controlling overarching design.

¶58 In fact, the scheme of the rules exhibits a distinct preference for testimony based on personal knowledge, and with some explicitly-articulated exceptions, like that for expert testimony, it is therefore designed to exclude testimony about matters of which the witness lacks personal knowledge. See CRE 602, 702, 703. Rather than attempt to rigidly limit non-expert witness testimony to bare descriptions of the witness's first-hand sense impressions, however, the rules contemplate that, within circumscribed limits, witness testimony may take the form of opinions, or

inferences,[1] rationally derived from those perceptions. See CRE 701. Beyond testimony based on personal knowledge, a qualified expert witness is also permitted to testify to scientific, technical, or other specialized knowledge if doing so will assist the trier of fact, and such a qualified expert is permitted to present this testimony in the form of opinion or otherwise. CRE 702. But in the case of expert opinion, as distinguished from lay opinion, the facts or data upon which the expert bases his opinion or inference need not have been perceived by the witness himself. Finally, and critical to the question of child witnesses at issue here, in addition to these other provisions addressing lay and expert opinion testimony generally, evidence in the form of opinion is expressly made admissible for the limited purpose of attacking or supporting the credibility of a witness to the extent that it refers to the character of the witness for truthfulness or untruthfulness, but even then, opinion evidence supporting truthfulness is admissible only after the character of the witness for truthfulness has been attacked. See CRE 608(a).

¶59 Perhaps because it does not focus on the actual language of the governing rules, the majority also fails to distinguish testimonial evidence generally from testimony given in the form of opinion, instead largely treating the terms "testimony" and "opinion" as interchangeable. Rule 701 clearly governs only the admissibility of opinion testimony that is not expert opinion; rule 702 governs the admissibility of all expert testimony, whether or not it takes the form of opinion; and rule 608(a) addresses the circumstances under which evidence in the form of opinion or reputation concerning the credibility of a witness will be permitted. The three rules intersect, or overlap, to the extent (but only to the extent) that they govern opinion testimony, as distinguished from testimony describing the witness's perceptions themselves or, in the case of expert testimony, relating

or applying acquired scientific, technical, or specialized knowledge. And to the extent that testimony attacking or supporting the credibility of a witness does not take the form of opinion or reputation evidence, it is not governed by rule 608(a) at all, whether the witness's character for truthfulness has already been attacked or not.

¶60 Apart from methodological transgressions in reaching its holding, I find the majority's new formula for distinguishing lay from expert testimony itself to be problematic for several reasons. Although it nominally asserts that classifying opinion testimony as either lay or expert according to the rules is dependent upon the actual basis for the opinion in question, the majority articulates its new formula for distinguishing one from the other in terms of what the testimony "could be expected to be based on" and what qualifications it "could not be offered without." Maj. op. ¶ 16. In addition, this formula clearly conflates the qualifications required by CRE 702 of a witness to offer an expert opinion ("knowledge, skill, experience, training or education,") with the subject matter of the expert opinion itself ("scientific, technical, or other specialized knowledge"). And to further complicate matters, the majority injects into the mix the undefined concept of an "ordinary person"—a term not found in either rule—giving its formula a distinctly circular quality. (Apparently "specialized knowledge" is knowledge that an "ordinary person" could not be expected to have and an "ordinary person" is one who could not be expected to have "specialized knowledge.")

¶61 Because CRE 702 permits testimony as to scientific, technical, or other specialized knowledge and CRE 701 permits only opinion testimony that does not include opinions based on such knowledge, the difference between opinion testimony admissible under each rule must turn, at least in part, on the meaning of the phrase "scientific, technical,

1. CRE 701 permits lay testimony in the form of "opinions and inferences," while the text of the federal rule only provides for lay testimony in the form of "an opinion." The federal rule previously permitted lay testimony in the form of "opinions or inferences," but the 2011 federal amendments removed all references to the term "inference" in Rule 701 "on the grounds that the deletion made

the Rule flow better and easier to read, and because any 'inference' is covered by the broader term 'opinion.'" Fed. R. Evid. 701 advisory committee's note (2011). Additionally, the advisory committee observed that "[c]ourts have not made substantive decisions on the basis of any distinction between an opinion and an inference." Id.

or other specialized knowledge." In People v. Stewart, 55 P.3d at 123 & n.10, which was decided by this court on the very cusp of our amendment to CRE 701 following the corresponding federal amendment, we made clear that the 2000 federal amendment to Fed. R. Evid. 701, which added the words "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," merely clarified that expert and lay opinion were always intended to be mutually exclusive, precluding any overlap of the two from their inception. That being the case, we found that the trial court erred by permitting the officer in that case to testify as a lay person about his reconstruction of the crime scene because his deductions about such matters as the vehicle's direction, position, and speed, despite being based in part on his perceptions and observation of the scene itself, were also based on his training and education. Id. at 124.

¶62 In addition to finding this amendment to rule 701 merely a clarification rather than a change, I believe we made clear in Stewart that an inference actually based on the witness's training or education cannot be admitted without his qualification as an expert witness. Whether or not it could have been rationally based on the witness's first-hand perceptions alone, without any formal training whatsoever, an opinion admittedly based on the witness's training or education acquires additional weight by being cloaked in the mantle of expertise and, for that reason if none other, is admissible, if at all, only as expert opinion, pursuant to CRE 702. The majority perfunctorily dismisses the defendant's objections to admission of the forensic interviewer's qualifications on grounds that they were matters within her personal knowledge and were not sufficiently challenged as to relevance, and therefore it fails to acknowledge that testimony based on training is neither testimony of the witness's own perceptions nor of inferences rationally based on his personal perceptions. Although I would find that the defendant adequately objected to admission of the forensic interviewer's training and adequately preserved his objection in this court, I consider it misleading, regardless of the merits of this dispute over preservation, to suggest that admitting testimony about the training or education upon which a witness's testimony is at least partially based is permissible without qualifying that witness as an expert.

¶63 In addition to admitting as lay opinion some testimony I believe to be admissible only as expert testimony, I also believe the majority's new formula would classify as expert some testimony I would consider to be admissible as lay opinion. In particular I believe the majority fails to distinguish experiences that an "ordinary person" would not have had from inferences that could not be rationally derived from those experiences without specialized knowledge, effectively requiring qualification as an expert to testify about the former rather than merely about the latter. While the question of relevance necessarily remains, as always, a central concern, relating one's own experience is definitionally a matter within his personal knowledge, regardless of the uniqueness of that experience. An inference from personal experiences, however, necessarily becomes a matter of expert opinion if it can only be drawn with the aid of specialized knowledge. Thus, for example, recounting or summarizing a witness's personal experiences with interviewing children is not itself a matter of specialized knowledge, but inferring something about the general population of children from the sample consisting of those actually interviewed by the witness is clearly a matter of specialized knowledge, requiring the application of principles of empirical modelling and inferential statistics.

¶64 As we have noted in the past, an expression of the result or meaning of a comparison or scientific test in terms of a frequency or likelihood of occurrence is itself a matter of expertise, separate and apart from the reliability or acceptance of the test or comparison it concerns, requiring an independent demonstration of its reliability. See, e.g., People v. Wilkerson, 114 P.3d 874, 876–77 (Colo. 2005). Testimony about the typicality of particular occurrences in a witness's personal experience, as distinguished from an opinion that the same frequency of occurrence would appear in the relevant population as a whole, have often been admitted as

lay opinion. See generally 3 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 7.3 (4th ed. 2013). Whether testimony of this nature would be sufficiently probative of a material issue to be admissible in any particular case, without expressing any opinion in terms implying an expert conclusion about a broader population, however, must remain a matter of trial court discretion, just as with all other matters of relevance. The uniqueness of the witness's experience does not, however, in and of itself, make testimony about it a matter of expertise.

¶65 For somewhat different reasons, I find the majority's treatment of CRE 608(a), under the rubric of "Bolstering," to be equally problematic. I understand the majority to hold that CRE 608(a) prohibits a witness from implying, either directly or indirectly, that someone else is telling the truth on a particular occasion; and that testimony by the forensic examiner and the mother of one of the victims—in the interviewer's case, testimony that children who had been sexually assaulted commonly gave conflicting details and in the mother's case, testimony that her daughter was not sophisticated enough to make up a story about sexual assault and had no reason to accuse the defendant—amounted to testimony that the child-witnesses were telling the truth. While I agree that testimony to the effect that a testifying witness personally believes someone else is telling the truth—in the sense that the witness believes that the other person made the statement in question without intending to deceive—is not admissible evidence in this jurisdiction, I do not agree that the admissibility of such testimony is governed by CRE 608(a), nor do I agree that the testimony in

question should have been excluded as necessarily offered for this purpose.

¶66 Rule 608 expanded the long-accepted principle of evidence law permitting a witness's character for truthfulness, that is, his character for veracity, or disposition for telling the truth rather than lying, to be attacked or supported with evidence of his reputation in the community, and it did so by permitting similar attack or support by opinion evidence.[2] As the 2011 rewrite of the federal rule made crystal clear, Rule 608 was never intended to prohibit the admissibility of other evidence of credibility, but only to make admissible character evidence based on personal opinion, in the same manner as evidence of reputation.[3] That this was the intended interpretation of the rule should have been apparent, if not sooner, at least by the time of the 2003 amendment to Fed. R. Evid. 608(b), pointedly replacing the word "credibility" with the phrase "character for truthfulness."[4] As the official comments to the rule made clear, the term "credibility" was considered too imprecise, as it could also be understood to limit attack on the basis of "bias, competency and contradiction impeachment since they too deal with credibility," which was never the intent of the rule. Fed. R. Evid. 608 advisory committee's note (2003). As the comment also made clear, "the Committee found it unnecessary to substitute 'character for truthfulness' for 'credibility' in Rule 608(a), because subdivision (a)(1) already served to limit impeachment to proof of such character." Id.

¶67 Although we have held it error, at least since the adoption of the Colorado Rules of Evidence, to permit an expert witness to express an opinion on the question whether a child-victim was speaking the truth on a specific occasion, the scope and

**2.** See Mueller & Kirkpatrick, supra § 6.30, at 174–76 (explaining that attacking a witness's veracity through reputation testimony was proper under common law tradition and that Fed. R. Evid. 608(a) "sweeps away the artificial distinction between reputation and opinion, so a character witness may give his opinion that the principal witness is by disposition untruthful.")

**3.** Fed. R. Evid. 608(a) now provides that "[a] witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or

untruthfulness, or by testimony in the form of an opinion about that character," and the advisory committee expressly stated that the 2011 changes to Rule 608(a) were "intended to be stylistic only," Fed. R. Evid. 608 advisory committee's note (2011).

**4.** This court followed suit by amending CRE 608(b) to replace "credibility" with "character for truthfulness" in an order dated September 29, 2005, which became effective January 1, 2006.

source of that proposition and its relation to CRE 608(a) and opinion evidence of "character for truthfulness" have always been somewhat unclear. At times, we have indicated simply that such statements did not qualify for admission under CRE 608(a), see, e.g., People v. Gaffney, 769 P.2d 1081, 1088 (Colo. 1989), and at others, that they were actually rendered inadmissible by CRE 608(a), see, e.g., Tevlin v. People, 715 P.2d 338, 341 (Colo. 1986) (relying on the court of appeals' rationale in People v. Koon, 713 P.2d 410 (Colo. App. 1985)). At times, we have suggested that the only use for an expert opinion that the child was almost certainly telling the truth would be as support for his truthful character, see, e.g., People v. Snook, 745 P.2d 647, 649 (Colo. 1987), and at others, we have emphasized that even if the child's character for truthfulness had already been attacked, CRE 608(a) would have merely permitted an expert opinion supporting his general character for truthfulness, but not an opinion that he was speaking the truth, see, e.g., Gaffney, 769 P.2d at 1088.

¶68 If not before, I believe that since the more recent amendments to both the federal and Colorado Rules 608, it is manifest that by "credibility" these rules refer solely to a person's character for veracity, or disposition for lying; and that an opinion to the effect that another was speaking truthfully on a particular occasion does not amount to opinion evidence of his general character for truthfulness. While I believe the proposition that an expert witness is not permitted to testify that he believes another was speaking truthfully on a particular occasion is largely a valid proposition, I do not believe it can be attributed to CRE 608(a). Whether such opinions are not considered rationally inferable from personal knowledge at all, see CRE 701, not helpful to the jury, see id. not based on reliable science or expertise, see CRE 702; see also People v. Shreck, 22 P.3d 68, 77 (Colo. 2001), or simply not sufficiently probative in the balance against countervailing policy considerations, see CRE 403, we have long made clear that notwithstanding CRE 704, which permits opinions as to ultimate issues, "the rules were not intended to permit experts to 'tell the jury what result to reach.' " Gaffney, 769 P.2d at 1087.

¶69 More problematic, however, than simply perpetuating this misconception about the scope of CRE 608 is the majority's reliance on Snook for the broader proposition that the sole purpose for testifying that "children who had been sexually assaulted commonly gave conflicting details" was to "bolster the children's credibility," maj. op. ¶ 36, or in the words of Snook itself (quoted by the majority), "as support for the complainant's truthful character," 745 P.2d at 649. Unlike other cases in which we have simply found that opining about a child's statements in terms that were effectively the same as, and would be understood by a jury as, opining that the child was speaking the truth, see, e.g., Gaffney, 769 P.2d at 1087–88 (child's statements were "very believable"); People v. Eppens, 979 P.2d 14, 17–19 (Colo. 1999) (child's statement was "sincere"), in Snook, this court appeared to extend that reasoning to find that an expert opinion that children tend not to fabricate amounted to both testimony that the child-victim was telling the truth on a particular occasion and testimony that would be support for the child's truthful character, see 745 P.2d at 649. It did so on the rationale that this was the sole use or purpose for such a statement, and in the absence of any prior attack on the victim's character for truthfulness, it therefore found that admission of the statement violated CRE 608(a). See id.

¶70 Without challenging in any way the correctness of our finding in Snook that it was error to admit an expert opinion that children tend not to fabricate, the suggestion that such testimony amounts to an opinion that a person was speaking truthfully on a specific occasion or an opinion in support of his character for truthfulness, solely because it has that effect or is used for that purpose, can no longer be sustained. A belief that another person is speaking truthfully on a particular occasion is clearly not reputation or opinion evidence of that person's character for truthfulness, as contemplated by CRE 608(a); does not offer support for such a disposition or character trait at all; and as we made clear barely a year later, is neither precluded, nor made admissible upon prior attack, by CRE 608(a). See Gaffney, 769 P.2d

at 1088. As we also made clear in Gaffney, with numerous examples of admissible expert opinion, CRE 608(a) does not prohibit all statements that may tend to support the credibility of a person's out-of-court statements or in-trial testimony. Id. at 1086.[5]

¶71 In perhaps our earliest interpretation of CRE 702 as permitting social science or so-called "syndrome" evidence, without demonstrating compliance with the Frye test,[6] we found to be admissible expert testimony concerning Rape Trauma Syndrome, to the effect that a rape victim who knows her assailant is generally more reluctant to report the assault. See People v. Hampton, 746 P.2d 947 (Colo. 1987). In Hampton, we not only distinguished this opinion testimony from an opinion as to the truthfulness of the victim but found it admissible for the express purpose of demonstrating that the victim's testimony was consistent with or—as we later said in Gaffney, 769 P.2d at 1087—for the purpose of corroborating her testimony with respect to late reporting of the crime. Hampton, 746 P.2d at 951–52. Whether or not sufficient foundation could have been laid to admit as an expert opinion the forensic interviewer's testimony in this case concerning conflicting details by child sexual-assault victims, I disagree that her testimony was barred for

having been offered either as a personal belief that the witnesses were speaking the truth on this occasion or as support for their character for truthfulness.

¶72 In addition to finding no support in the Rules of Evidence, disallowing otherwise admissible opinion evidence on the ground that, despite not itself being an opinion about another person's character for truthfulness or his intent to deceive, it would have the effect of, or was offered for the purpose of, supporting the truthfulness of a particular statement, is simply unworkable in practice. Virtually any evidence relevant to the commission of a crime can reasonably be characterized as ultimately supporting the testimony or out-of-court statement of another asserting that the crime occurred. As our holding in Hampton demonstrates, even testimony expressly offered as relevant solely on the question of lying by a purported sexual assault victim may be admissible.

¶73 No less than in Hampton, the forensic interviewer's testimony in this case concerning the likelihood of conflicting detail in child-sexual-assault-victim statements can fairly be characterized as having been offered for the purpose of disputing what would be widely accepted as indicia of fabrication. Unlike the majority, I believe the

---

**5.** This court in Gaffney observed that with respect to statements supporting the credibility of a child-victim's out-of-court statements or in-trial testimony concerning a sexual crime:

> CRE 702 ... states that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert may testify thereto in the form of opinion or otherwise. See, e.g., United States v. St. Pierre, 812 F.2d 417 (8th Cir. 1987) (clinical psychologist's testimony as to certain traits and characteristics of sexually abused children as compared with those exhibited by child-victim was admissible); State v. Moran, 151 Ariz. 378, 728 P.2d 248 (1986) (in child molestation case, expert testimony that child-victim's behavioral characteristics, including recantation of sexual abuse by father, matched characteristics of other child-victims of sexual abuse was admissible to assist jury in explaining strange behavior of child-victim, although expert testimony calculated to tell jury that expert believed victim's earlier version of abuse was not admissible); People v. Koon, 724 P.2d 1367 (Colo.App. 1986) (expert testimony by police psychologist about specific behavior-

al patterns of child incest victim admissible where expert witness did not render opinion as to whether child was truthful in report of assault or was actual victim of incest); State v. Middleton, 294 Or. 427, 657 P.2d 1215 (1983) (expert witness permitted to testify concerning the reaction of a typical child-victim of familial sex abuse and to offer opinion whether victim, who had been impeached by prior inconsistent statements, reacted in typical manner in making inconsistent statements); cf. People v. Hampton, 746 P.2d 947 (Colo. 1987) (expert testimony concerning rape trauma syndrome admissible in sexual assault prosecution to corroborate testimony of victim with respect to late reporting of crime).

Gaffney, 769 P.2d at 1086–87.

**6.** Under the Frye test, expert scientific testimony may be admitted if "the thing from which the deduction is made [is] sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923). In Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the U.S. Supreme Court held that the Frye test was superseded by Fed. R. Evid. 702.

admissibility of such testimony turns on whether it was admissible as expert testimony, under CRE 702, and if not, whether it amounted to testimony of personal knowledge, as required by CRE 602, or was admissible as a rational inference from personal knowledge, under CRE 701. It was clearly not an expression of personal belief that the child-victims in this case were speaking the truth in making their particular accusations, and I would not perpetuate the confusion that has obscured for many years in this jurisdiction the applicability of CRE 608(a) solely to opinion evidence of character for truthfulness.

¶74 For similar reasons, I do not believe the statements of one of the victims' mothers were inadmissible for communicating her belief that her child was telling the truth. Her testimony to the effect that her child was not sophisticated enough to make up a story about sexual assault and that the child had no reason to do so was clearly not merely an expression of personal belief that her child was speaking the truth. On its face, this was an assessment of both her child's capacity and lack of motive. Whether she could be qualified, based on her personal experience with her child alone, to offer an opinion about the extent of her child's psychological development and awareness of sexual matters or the reasons why her child, in particular, might or might not be motivated to fabricate an accusation of sexual assault against a particular individual, are matters governed by CRE 701 and 702—not CRE 608. Had it been possible to lay an adequate foundation for her to offer an opinion on these matters, that opinion would most certainly not have been barred by the fact that it might at one and the same time effectively communicate a belief that her child was telling the truth.

¶75 Unlike the majority, I would not perpetuate what is, at least by this point in time, a clear misreading of CRE 608, or saddle trial courts with the unenviable task of assessing whether testimony which, on its face, in no way expresses a personal belief about a witness's intent to deceive is nevertheless offered with that as its real purpose. While we have consistently found science incapable of reliably determining whether someone is speaking the truth, see People v. Anderson, 637 P.2d 354 (Colo. 1981) (disallowing lie detector results), we have on a number of occasions found empirical evidence sufficiently reliable and helpful on the question of typical behavior patterns of sexual assault victims or the question whether traits ordinarily associated with fabrication nevertheless appear with regularity in accusations by individuals claiming to be sexual assault victims that ultimately prove to be accurate. The admissibility of testimony supporting the credibility of another in any manner other than providing opinion or reputation evidence of his character for truthfulness is governed by considerations outside CRE 608.

¶76 I would reverse the defendant's sexual-assault-related convictions because the forensic interviewer's conclusion about the typicality of conflict in the accusations of child-sexual-assault victims was based in part, even according to her own testimony, on her training and education, rather than simply her own observations. In addition, the mother's assessment of her own daughter's capacity and motive for fabricating lacked any foundation whatsoever, as either lay or expert opinion.

¶77 I therefore concur in the judgment of the court.

I am authorized to state that JUSTICE EID joins in this concurrence judgment.