1
 2026 CO 23 Gustavo Lopez, Petitioner v. The People of the State of Colorado. Respondent No. 24SC244Supreme Court of Colorado, En BancApril 13, 2026
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 19CA2313
 
 2
 
          
 Attorneys for Petitioner: Megan A. Ring, Public Defender
 Meghan M. Morris, Deputy Public Defender Denver, Colorado
 
 
          
 Attorneys for Respondent: Philip J. Weiser, Attorney General
 Frank R. Lawson, Senior Assistant Attorney General Denver,
 Colorado
 
 3
 
          
 JUSTICE SAMOUR delivered the Opinion of the Court, in which
 JUSTICE HOOD, JUSTICE GABRIEL, and JUSTICE BERKENKOTTER
 joined. CHIEF JUSTICE MARQUEZ, joined by JUSTICE BOATRIGHT
 and JUSTICE BLANCO, dissented.
 
 4
 
          
 OPINION
 
 
          
 SAMOUR, JUSTICE
 
 5
 
          ¶1
 "[O]ne who induces a trial court to let down the bars to
 a field of inquiry that is not competent or relevant to the
 issues cannot complain if his adversary is also allowed to
 avail himself of the opening." 1 Kenneth S. Broun et
 al., McCormick on Evidence § 57, Westlaw
 (Robert P. Mosteller ed., 9th ed. database updated Feb. 2025)
 (quoting Warren Live Stock Co. v. Farr, 142 F. 116,
 117 (8th Cir. 1905)). The majority of courts seem to heed
 this general principle of "fighting fire with
 fire," though it is known by different monikers. See
 id.; see also Bearint ex rel. Bearint v. Dorel Juv.
 Grp., Inc., 389 F.3d 1339, 1349 (11th Cir. 2004)
 ("This Circuit recognizes the concept of 'curative
 admissibility'-also called 'opening the door' or
 'fighting fire with fire.'"). In Colorado, the
 principle travels under the banner of "opening the
 door." See, e.g., People v. Melillo,
 25 P.3d 769, 775 (Colo. 2001).
 
 
          ¶2
 Courts across the country beat to different drums in their
 application of the door-opening principle. 1 Broun et. al,
 supra, § 57. In Hemphill v. New York,
 595 U.S. 140, 152 (2022), for example, the Supreme Court
 observed that New York's version of the principle
 requires state courts "to determine whether one
 party's evidence and arguments, in the context of the
 full record, have created a 'misleading impression'
 that requires correction with additional material from the
 other side." Colorado largely speaks the same language
 as New York when it comes to the opening the door doctrine.
 See People v. Murphy, 919 P.2d 191, 195 (Colo.
 1996).
 
 6
 
 We have explained that a party may open the door to otherwise
 inadmissible evidence by selectively presenting "facts
 that, without being elaborated or placed in context, create
 an incorrect or misleading impression."[1]Golob v.
 People, 180 P.3d 1006, 1012 (Colo. 2008) (citing
 Murphy, 919 P.2d at 195). The doctrine aims to
 prevent a party "from gaining and maintaining an unfair
 advantage" at trial. Id.; see also People v.
 Miller, 890 P.2d 84, 98-99 (Colo. 1995) (same).
 
 
          ¶3
 In this sexual assault on a child case, the People presented
 the testimony of Kim Grimm, who conducted the forensic
 interviews with the child victims, N.L. and A.L. After Grimm
 described her interviews with N.L. and A.L. and offered
 generalized expert opinions on conducting forensic interviews
 with children in criminal cases-including the signs of
 coaching she is trained to look for-a juror submitted a
 question for her. The juror inquired whether the child
 victims'
 
 7
 
 behaviors during Grimm's interviews were consistent with
 the behaviors of children she'd observed in cases where
 she'd discerned that coaching had occurred. Defense
 counsel objected, arguing that the question called for Grimm
 to offer an expert opinion on the credibility of the
 children. But the trial court overruled the objection and
 allowed the question. Grimm then testified that she
 didn't "feel like [she] saw huge red flags with that
 or anything that indicated that." Elaborating, she
 stated that each child was able to provide very specific
 experience-based details regarding the events in question.
 The jury later found the defendant, Gustavo Lopez, guilty of
 the charges.
 
 
          ¶4
 Lopez appealed, and a split division of the court of appeals
 affirmed the judgment of conviction in a published opinion.
 People v. Lopez, 2024 COA 26, ¶ 56, 550 P.3d
 731, 741. The division agreed with Lopez that Grimm's
 response to the juror's question was inadmissible,
 reasoning that an expert witness may not testify about the
 lack of indicia of coaching during a child victim's
 interview. Id. at ¶ 12, 550 P.3d at 734. Such
 testimony, explained the division, is analogous to an opinion
 about another witness's truthfulness on a particular
 occasion, which is improper. Id. But the division
 nevertheless upheld the trial court's ruling under the
 opening the door doctrine. Id. at ¶ 13, 550
 P.3d at 734. It determined that the defense had opened the
 door to the otherwise inadmissible testimony by persistently
 advancing the theory at trial that the children's
 maternal grandmother wanted to
 
 8
 
 keep custody of them and had therefore coached them or
 otherwise influenced them "to fabricate the
 allegations" or form "false memories of
 abuse." Id. at ¶ 23, 550 P.3d at 736.
 Lopez then sought our review, and we granted his petition.
 
 
          ¶5
 Whether Grimm's answer to the juror's question was
 admissible is a sticky wicket, but one on which we do not
 need to bat today. The question Lopez has asked us to address
 revolves around the opening the door doctrine: Whether the
 division erred in holding that he opened the door to the
 challenged expert testimony. And in Colorado, that doctrine
 stirs to life only when the evidence in question is
 inadmissible.
 
 
          ¶6
 We now affirm. Assuming, without deciding, that the testimony
 at issue was inadmissible, we hold that the defense opened
 the door to it by repeatedly suggesting to the jury-through
 both the introduction of evidence and the presentation of
 argument-that the children had been coached or otherwise
 improperly influenced by their maternal grandmother because
 she wanted to maintain custody of them. By consistently
 attacking the credibility of the children with assertions
 that they had been coached, the defense opened the door to
 Grimm's testimony that she perceived no indication of
 coaching.[2]
 
 9
 
          I.
 Facts and Procedural History
 
 
          ¶7
 As relevant here, Lopez was charged with sexual assault by
 one in a position of trust and aggravated incest against each
 of his two young children: N.L. (his son) and A.L. (his
 daughter). Two different events gave rise to the charges.
 First, on one occasion, Lopez inserted his finger into
 N.L.'s anus three times while spanking him. N.L.
 experienced bleeding and significant pain in his anus the
 following day. Second, Lopez drove A.L. to a parking lot, got
 into the backseat of the car with her, pulled down his pants,
 and attempted to place her hand on his penis. She refused and
 started crying, so he offered her $100. Because she continued
 to refuse, he returned to the front seat. He warned her,
 however, not to tell anyone about the incident.
 
 
          ¶8
 Following the children's outcries, Lopez was arrested.
 Upon seizing his cell phone, investigators discovered images
 of prepubescent children in various stages
 
 10
 
 of undress. These images depicted some children exposing
 their genitalia and others performing sexual acts.
 
 
          ¶9
 Contrary to their outcries, N.L. and A.L. didn't allege
 any wrongdoing by Lopez during initial interviews conducted
 by a social worker. However, each later made sexual abuse
 allegations against their father during a forensic interview
 conducted by Grimm. The children's testimony at trial was
 consistent with their statements to Grimm.
 
 
          ¶10
 The theory of the defense at trial was that the
 children's maternal grandmother had coached them or
 otherwise influenced them to fabricate the allegations or
 form false memories of abuse because she wanted to maintain
 custody of them. Defense counsel wove this theme throughout
 the trial, from the initial ripple to the final
 wave-introducing it in voir dire, incorporating it into the
 opening-statement roadmap, reinforcing it through witness
 examinations and testimony, and hammering it home in closing
 arguments.
 
 
          ¶11
 In support of the defense's theory, counsel advanced
 multiple arguments: during the initial interviews conducted
 by a social worker, when the children weren't yet living
 with their grandmother, they did not report any wrongdoing by
 Lopez; when the children later disclosed the allegations
 (during Grimm's forensic interviews), there was turmoil
 in the family and the children had been living with their
 grandmother for approximately nine months; there were
 inconsistencies
 
 11
 
 within each of the children's statements; there was no
 physical evidence supporting the allegations; at the time of
 Grimm's interviews, the children admittedly wanted to
 live with their grandmother rather than with their parents;
 not long before Grimm's interviews, the children's
 mother told their grandmother that she wanted the children
 back; and the children were aware that their grandmother
 wanted them to report the allegations to Grimm.
 
 
          ¶12
 The People introduced videos of the forensic interviews of
 N.L. and A.L. through Grimm. And, in response to
 direct-examination questions, Grimm discussed her interviews
 with the children.
 
 
          ¶13
 Additionally, without objection, the People qualified Grimm
 as an expert witness and elicited from her generalized expert
 opinions on child forensic interviewing. Grimm educated the
 jury about the purpose and general structure of a child
 forensic interview, techniques she uses to try to obtain an
 accurate and complete account of an incident, the concept of
 suggestibility, the degree to which outside forces may
 influence a child's storage and retrieval of a memory,
 steps to mitigate the risk of inadvertently influencing a
 child, and the concept of a child being coached to say
 something happened when it didn't actually happen. On the
 issue of coaching specifically, Grimm talked about the signs
 that forensic interviewers are trained to look for:
 
 
 [I]f a child is being coached, it is more difficult for them
 to describe all the details of what they can hear, what the
 room looked like, meaning
 
 12
 
 what the clothing looked like that they were wearing, exactly
 what was said or how they felt in that situation. When a
 child is coached, it is typically difficult for them to
 recall that information because in coaching a lot of times
 people aren't telling the child to say all of these
 things as well.
 
 
          ¶14
 On cross-examination, Grimm acknowledged that her role in
 interviewing N.L. and A.L. was not to make credibility
 determinations or to investigate whether anyone had coached
 them or otherwise improperly influenced them. Further, Grimm
 stressed that she was neither opining about the
 children's character for truthfulness nor vouching for
 their credibility during her interviews. Nor, she explained,
 could she testify about whether the children were telling
 their stories for the first time or the hundredth time when
 they spoke with her. She also agreed with defense counsel
 that her questions were not intended to "get a specific
 answer." To the contrary, she reiterated that,
 consistent with her training, she tried to avoid suggestive
 questions. And she recognized that, while she endeavored to
 be careful not to influence either child's account of the
 allegations, she could not speak about whether people had
 previously asked the children suggestive questions.
 
 
          ¶15
 When Grimm had finished answering the lawyers' questions,
 a juror submitted a written question for the court to ask
 her. The juror wanted Grimm to compare N.L.'s and
 A.L.'s behaviors during her interviews to those of
 alleged child sexual-assault victims she'd interviewed
 who had been coached: "In your
 
 13
 
 expert opinion, was either [N.L.'s] or [A.L.'s]
 behavior consistent with interviews where coaching was
 present?" Defense counsel objected, arguing that the
 question called for Grimm to "opine as to [the]
 credibility of [other] witness[es]," namely, N.L. and
 A.L. The People responded that the question was
 "relevant and appropriate" because, without
 objection, Grimm had discussed coaching with the jury.
 Besides, noted the People, this was not a question about
 whether Grimm believed the children were telling the truth
 during her interviews; instead, the question was simply
 inquiring whether Grimm had observed signs of coaching in
 either of the children, an area in which she'd been
 properly qualified to opine as an expert.
 
 
          ¶16
 The trial court overruled the objection. It concluded that
 "[c]oaching is . . . different . . . broader than merely
 commenting on credibility, which the appellate court cases
 frown upon." The court thus relayed the juror's
 question to Grimm, and she answered as follows:
 
 
 In my opinion I don't feel like I saw huge red flags with
 that or anything that indicated that because both children
 were able to provide very specific experience-based details
 around the events that they did talk with me about.
 
 
          After
 this exchange, at defense counsel's prodding, Grimm
 conceded that where, as in this case, child victims offer
 varying accounts of the charged incidents, one possible
 explanation is that they are not telling the truth.
 
 14
 
          ¶17
 The jury returned guilty verdicts on all counts. Lopez then
 appealed. His primary argument before the division was that
 the trial court erred in permitting Grimm to opine that she
 saw no indication of coaching. This testimony was
 inadmissible, contended Lopez, because it vouched for the
 children's truthfulness during their forensic interviews.
 
 
          ¶18
 A fractured division affirmed the trial court's ruling on
 other grounds in a published opinion. Lopez,
 ¶¶ 30, 56, 550 P.3d at 737, 741. Relying on the
 decisions of two other divisions, People v. Bridges,
 2014 COA 65, ¶ 16, 410 P.3d 512, 514-15, and People
 v. Heredia-Cobos, 2017 COA 130, ¶ 17, 415 P.3d 860,
 864, the division first agreed with Lopez that expert
 witnesses "may not opine that a child was not coached in
 making allegations" or even that there were no signs of
 coaching during a child's interview. Lopez,
 ¶ 12, 550 P.3d at 734. The division noted that it is now
 well settled in Colorado that a witness may not testify that
 another witness told the truth on a particular occasion.
 Id. And, in the division's view, the challenged
 expert testimony crept too close to testimony about another
 witness's truthfulness during an interview and was thus
 "tantamount to vouching" for that witness's
 credibility on a specific occasion. Id. (quoting
 Heredia-Cobos, ¶ 14, 415 P.3d at 864).
 
 
          ¶19
 But the division then agreed with the People that, to the
 extent the expert testimony at issue was inadmissible, Lopez
 opened the door to it by continuously
 
 15
 
 maintaining that the children's allegations were the
 product of coaching or improper influence by identifiable
 individuals. Id. at ¶ 23, 550 P.3d at 736.
 Drawing from the analytical map charted in Bridges
 and Heredia-Cobos, the division explained that Lopez
 opened the door to the testimony in question by persistently
 advancing the theory that grandmother had coached the
 children or otherwise influenced them to fabricate the
 allegations or form false memories of abuse. Id.
 
 
          ¶20
 The division hastened to add a caveat, however: Simply
 attacking a child victim's credibility doesn't open
 the door to otherwise inadmissible coaching testimony.
 Id. at ¶ 24, 550 P.3d at 736. Rather, explained
 the division, the opening the door doctrine must be narrowly
 construed to permit such testimony only when the record
 establishes "that the defendant 'clearly intended to
 suggest to the jurors' that the child had been coached or
 otherwise improperly influenced by certain identifiable
 people." Id. (quoting Heredia-Cobos,
 ¶ 23, 415 P.3d at 866). Because the division concluded
 that the record in this case satisfied this condition, it
 upheld the trial court's ruling allowing Grimm to answer
 the juror's question. Id. at ¶¶ 24,
 30, 550 P.3d at 736-37.
 
 
          ¶21
 Judge Schutz dissented. He didn't bat an eye at the idea
 that a defendant in a criminal case may open the door to
 testimony about generic behaviors a coached witness typically
 manifests. Id. at ¶ 61, 550 P.3d at 742
 (Schutz, J., dissenting). Consequently, he acknowledged that
 when a defendant introduces evidence that
 
 16
 
 a child victim has been coached, the People are entitled to
 introduce "expert testimony explaining what factors the
 jury should consider" in evaluating whether the child
 has been coached. Id. at ¶ 71, 550 P.3d at 744.
 But Judge Schutz locked horns with his colleagues both in the
 division in Heredia-Cobos and in the division here
 on their conclusion that, under the opening the door
 doctrine, a witness may testify that a particular child
 didn't appear to have been coached. Id. In his
 view, expert testimony suggesting that a child didn't
 appear to have been coached, on the one hand, and expert
 testimony that a child told the truth, on the other, are the
 same dish on a different plate. Id. at ¶ 72,
 550 P.3d at 744-45. And because everyone agreed that the
 latter is improper, he asserted that the former must be as
 well. Id. Thus, he would not have followed
 Heredia-Cobos's holding, which he perceived as
 too broad and out of sync with our jurisprudence.
 Id. at ¶ 67, 550 P.3d at 743.
 
 
          II.
 Analysis
 
 
          ¶22
 We begin with a brief word about the division's
 analytical springboard-anchored in Bridges and
 Heredia-Cobos-that expert testimony that a child
 victim showed no signs of coaching is always inadmissible.
 This premise set the stage for the division's application
 of the opening the door doctrine-a finding of inadmissibility
 is the first rung on that ladder. Because the admissibility
 question is not before us, however, we quickly set it aside
 and simply assume,
 
 17
 
 without deciding, that Grimm's contested testimony was
 inadmissible. We therefore proceed to apply the opening the
 door doctrine.
 
 
          ¶23
 We ultimately agree with the division that Lopez opened the
 door to Grimm's expert testimony that she saw no
 indication of coaching during her forensic interviews with
 N.L. and A.L. Accordingly, we affirm. Before we turn out the
 lights, however, we offer two admonitions. First, as the
 division observed, the opening the door doctrine must be
 narrowly construed. Second, the width of the opening dictates
 how much the opposing party may carry through it.
 
 
          A.
 A Brief Word on the Division's Admissibility
 Analysis
 
 
          ¶24
 As noted, the division grounded its admissibility analysis in
 its sister divisions' decisions in Bridges and
 Heredia-Cobos. The division in Bridges
 determined, in short order, that the forensic
 interviewer's expert testimony that the two child victims
 had not been coached was just as improper and inadmissible
 under CRE 608(a) as expert testimony that a child victim told
 the truth on a specific occasion. Bridges, ¶
 16, 410 P.3d at 514. A few years later, the division in
 Heredia-Cobos followed suit; it similarly ruled,
 again with only a light analytical touch, that a forensic
 interviewer's expert testimony about a child victim not
 showing any signs of having been coached is just as improper
 and inadmissible under CRE 608(a) as testimony that a child
 victim told the truth during an interview.
 Heredia-Cobos, ¶ 16, 415 P.3d at 864. Like its
 predecessors, the division here seemingly
 
 18
 
 proceeded on the understanding that our case law had resolved
 the admissibility question under review. But the issue is
 more nuanced than the three divisions appear to have
 appreciated.
 
 
          ¶25
 Although it is clear that an expert witness may not
 directly vouch for the credibility of a child victim
 by opining that the child told the truth on a particular
 occasion, "the scope . . . of that proposition . . .
 ha[s] always been somewhat unclear." Venalonzo v.
 People, 2017 CO 9, ¶ 67, 388 P.3d 868, 885-86
 (Coats, J, concurring in the judgment). And our case law
 doesn't squarely resolve whether the ambit of the
 proposition stretches far enough to sweep in expert testimony
 either that a child victim has not been coached or that no
 signs of coaching were detected during a child victim's
 interview.[3]
 
 19
 
          ¶26
 This is a thorny issue to be sure. But it's one we have
 no occasion to prune today.
 
 
          ¶27
 The division agreed with Lopez that the disputed expert
 testimony was inadmissible, and the People didn't file a
 cross-petition to challenge that ruling. Only Lopez sought
 review, and the sole question he raised deals with the
 division's application of the opening the door doctrine.
 Of course, had the division deemed Grimm's challenged
 testimony admissible, there would have been no need to summon
 the opening the door doctrine, and any concerns Lopez and
 others may have about the application of the doctrine in this
 case would have been
 
 20
 
 rendered obsolete. Given the current posture of the case, we
 assume, without deciding, that the expert testimony in the
 spotlight was inadmissible and we accordingly turn our focus
 to the opening the door doctrine.
 
 
          B.
 Lopez Opened the Door to the Contested Expert
 Testimony
 
 
          ¶28
 We construe the contours of the opening the door doctrine
 de novo. See People v. Johnson, 2021 CO 35, ¶
 15, 486 P.3d 1154, 1158. However, a lower court's
 determination that a party opened the door to otherwise
 inadmissible evidence is subject to review for an abuse of
 discretion. Id. at ¶ 16, 486 P.3d at 1158. We
 likewise review a trial court's decision to admit expert
 testimony for an abuse of discretion. People v.
 Coons, 2021 CO 70, ¶ 41, 495 P.3d 961, 969.
 
 
          ¶29
 The opening the door doctrine may permit a party to present
 otherwise inadmissible evidence after the opposing party has
 introduced incomplete evidence that may lead the factfinder
 astray. See Golob, 180 P.3d at 1012. This judicially crafted
 rule serves to prevent a party from getting the upper hand at
 trial by selectively presenting facts that create an
 incorrect or misleading impression. Id.; see
 also Miller, 890 P.2d at 98-99 (same). Through the
 opening the door doctrine, a party may correct or otherwise
 place in context any such misimpression by bringing in
 evidence that would otherwise be barred. Golob, 180
 P.3d at 1012.
 
 
          ¶30
 In Golob, a whodunit case, the parties' experts
 examined partial shoeprints collected at the crime scene and
 compared them to the soles of Golob's boots.
 
 21
 
 180 P.3d at 1009. In response to questions on direct
 examination, the People's expert testified that he
 interpreted the conclusion in the defense expert's report
 to be consistent with his finding that it was highly probable
 that Golob's right boot made one of the prints collected
 at the crime scene. Id. In support of this
 testimony, the People's expert pointed to the defense
 expert's determination that the identifying marks on the
 soles of Golob's boots did not "conclusively
 match" the collected prints. Id. According to
 the People's expert, that determination meant that the
 defense expert's comparison fell within" the
 probable range." Id. (emphasis added)).
 Although the defense expert took issue with this
 interpretation of his report, he was unable to convey his
 disagreement to the jury because, based on the People's
 objection, the trial court limited his testimony to the
 "specific characteristics of Golob's boots" and
 precluded him from testifying about his comparison of the
 prints recovered to the soles of Golob's boots.
 Id. at 1009, 1012.
 
 
          ¶31
 We agreed with the trial court's decision to exclude the
 defense expert's testimony comparing the recovered
 shoeprints to the known footwear, as he lacked direct
 training and experience in that field. Id. at 1012.
 But we nevertheless held that the trial court "should
 have permitted [him] to offer his comparison testimony
 because the prosecution opened the door" to it:
 
 
 By limiting [the defense expert's] testimony, the trial
 court permitted the jury to hear only one side of this issue.
 [The defense expert] was
 
 22
 
 unable to explain the means by which he reached his opinion
 or how it differed from [the] opinion [offered by the
 People's expert]. Once the trial court permitted [the
 People's expert] to comment on [the defense expert's]
 opinion, it should have allowed [the defense expert] to
 testify on this subject to provide the full context of the
 print evidence to the jury.
 
 
 Id. at 1012-13. We added that the trial court's
 ruling allowed the testimony of the People's expert
 regarding the defense expert's report "to stand
 unchallenged and resulted in an unfair advantage . . .
 through the selective presentation of expert opinion to the
 jury on . . . important evidence." Id. at 1013.
 
 
          ¶32
 Taking our cues from Golob, we conclude that the
 division in this case correctly ruled that Lopez opened the
 door to the challenged expert testimony. As the division
 discerned, by repeatedly suggesting to the jury-through both
 the introduction of evidence and the presentation of
 argument-that the grandmother had coached the children or
 otherwise influenced them to fabricate the allegations or
 form false memories of sexual abuse, the defense opened the
 door to Grimm's expert opinion that she did not perceive
 any indication of coaching.
 
 
          ¶33
 In voir dire, defense counsel questioned prospective jurors
 about the topic of suggestibility: whether people can sway or
 influence family members; whether anyone had had experiences
 with people taking advantage of others or with people
 suggesting to others that something that isn't real is
 actually real; whether children are suggestible, prone to
 being taken advantage of, or susceptible to being manipulated
 into believing that something that's not real is actually
 real; whether
 
 23
 
 someone who is close to a child can convince the child to
 believe that something that's not real is actually real;
 and the possible motives someone may have for attempting to
 influence a child's perception of reality.
 
 
          ¶34
 Defense counsel went so far as to discuss a
 "hypothetical" to determine whether a prospective
 juror thought that an adult could suggest to a child that
 something happened even though it didn't happen. The
 hypothetical involved a five-year-old child whose grandmother
 was living with the child and wanted the child to stay with
 her. Before counsel could continue, the court sustained the
 People's objection, finding that defense counsel was
 asking "an improper staking out question" that
 included "the facts of the case or the purported
 facts" of the case and seeking to ascertain how the
 prospective juror "would judge" that scenario.
 
 
          ¶35
 The defense kept the same threads running during its opening
 statement. Defense counsel told the jurors that the versions
 of events they were about to hear would "differ based on
 who ha[d] control over the children" at any given time.
 Thus, counsel encouraged the jury to pay close attention to
 the timing of the children's statements, where the
 children were "when things [were] happening," and
 who the children were with "when they [were] making
 these various allegations."
 
 24
 
          ¶36
 Counsel further interlaced the defense theme into the fabric
 of the cross-examinations of the People's witnesses. For
 example, the defense introduced evidence in support of its
 coaching theory through its questions of A.L. Defense counsel
 asked A.L. about her denial of any wrongdoing by Lopez during
 the social worker's interview, which occurred before A.L.
 moved in with her grandmother. Counsel then juxtaposed that
 interview with the interview by Grimm, which occurred after
 A.L. moved in with her grandmother. Through further
 questioning, A.L. conceded the following: that she discussed
 with her grandmother why she was going to be interviewed by
 Grimm and what she planned to say during the interview; that
 her grandmother wanted to make sure A.L. would say exactly
 what she ended up saying during Grimm's interview; that
 she spoke to her brother before Grimm interviewed him, and
 that she was aware that her brother was also going to say
 "some stuff" during that interview; that she wanted
 to live with her grandmother; that her grandmother was aware
 this was her wish; and that her grandmother likewise wanted
 to live with her.
 
 
          ¶37
 In similar fashion, the defense introduced evidence in
 support of its coaching theory during the cross-examination
 of N.L. For example, defense counsel conveyed to the jury
 that, after moving in with his grandmother, N.L. recounted a
 different narrative to Grimm than the one he'd shared
 with the social worker. N.L. acknowledged that when he
 initially spoke to the social worker, he
 
 25
 
 didn't mention any inappropriate touching by Lopez. He
 further admitted that it was after he moved in with his
 grandmother that he told Grimm that Lopez had inappropriately
 touched him. Moreover, N.L. agreed with defense counsel that:
 he talked to his grandmother about Grimm's interview
 beforehand; his grandmother wanted to make sure he would tell
 Grimm what happened; and he told Grimm that he wanted to live
 with his grandmother rather than with his mother or father.
 
 
          ¶38
 Along the same lines, while the children's grandmother
 was on the stand, defense counsel suggested that the
 grandmother threw Lopez under the bus to keep custody of the
 children. Specifically, the defense elicited testimony from
 the grandmother that she delayed reporting the allegations of
 abuse for almost a year. She further agreed with defense
 counsel that she reported these allegations after the
 children's mother announced that she wanted to regain
 custody of the children.
 
 
          ¶39
 Next, during the cross-examination of Grimm, the defense
 presented evidence that the fact that there were multiple
 interviews conducted with each child gave rise to
 suggestibility concerns. Defense counsel also prompted Grimm
 to acknowledge that the children might have discussed the
 sexual abuse allegations with many people before their
 forensic interviews.
 
 26
 
          ¶40
 At the end of the trial, in closing argument, the defense
 drummed into the jurors the theme sowed in voir dire and
 nurtured throughout the trial. Counsel argued that the
 grandmother coached the children or otherwise influenced them
 to fabricate the allegations or form false memories.
 
 
          ¶41
 In sum, Lopez defended against the charges in this case by
 persistently presenting evidence and argument that the
 grandmother egged the children on to fabricate allegations or
 form false memories. The defense's theory of the case was
 that the children changed their initial stories and made
 unfounded allegations against Lopez during Grimm's
 forensic interviews because their grandmother had coached
 them or otherwise improperly influenced them. But that was
 only part of the story: the defense's telling. The rest
 of the story was filled in by Grimm, who opined, in response
 to a juror's question, that based on both her
 observations of N.L.'s and A.L.'s behaviors during
 her forensic interviews and her comparison of those behaviors
 to the behaviors of children she'd observed in cases
 where coaching appeared to be present, she detected no
 indication of coaching here.
 
 
          ¶42
 Given the defense's persistent theme and Grimm's
 unopposed generalized expert testimony about coaching, it is
 hardly surprising that a juror posed the question at issue:
 "In your expert opinion, was either [N.L.'s] or
 [A.L.'s] behavior consistent with interviews where
 coaching was present?" The jurors were almost invited to
 ask it. In essence, the juror's question sought to have
 Grimm apply her
 
 27
 
 generalized expert opinions-none of which the defense
 disputed-to the facts of the case, which is something expert
 witnesses are routinely permitted to do at trial. And
 precluding Grimm from addressing the juror's question
 would have given Lopez an unfair advantage by creating a
 misleading impression.
 
 
          ¶43
 There were, after all, two sides to the coaching coin. The
 defense's contention that the children were coached or
 otherwise improperly influenced by their grandmother was one
 side. The other was Grimm's answer to the juror's
 question: During her interview of each child, she saw no
 indication of coaching. Grimm's response supplied the
 context necessary to complete the picture the defense had
 painted. True, that evidence was prejudicial to Lopez, but
 our rules don't prohibit prejudicial evidence. What they
 prohibit is unfairly prejudicial evidence. And, in the
 context of the evidence introduced and arguments presented by
 Lopez, there was nothing unfairly prejudicial about
 Grimm's challenged expert testimony. Accordingly, we
 conclude that Lopez opened the door to it.
 
 
          C.
 Two Admonitions
 
 
          ¶44
 As we come down the home stretch, we feel compelled to part
 with two admonitions. First, we wholeheartedly agree with the
 division that the opening the door doctrine must be narrowly
 applied. Lopez, ¶ 24, 550 P.3d at 736. Lopez
 could not have opened the door to the expert testimony at
 issue simply by
 
 28
 
 challenging the child victims' credibility. The door was
 opened in this case because defense counsel repeatedly
 suggested-through the introduction of evidence and the
 presentation of argument-that the children had been coached
 or otherwise improperly influenced by their grandmother.
 
 
          ¶45
 Second, "[m]erely because a defense attorney opens the
 door does not mean that a prosecutor can come storming
 through it in a pair of hobnailed boots." United
 States v. Sepulveda, 15 F.3d 1161, 1189 n.24 (1st Cir.
 1993). People v. Cohen, 2019 COA 38, ¶ 23, 440
 P.3d 1256, 1262-63. As Lopez urges, any evidence admitted
 under the opening the door doctrine must be limited to that
 necessary to remove any unfair prejudice that may have ensued
 from the original evidence. See People v. Cohen,
 2019 COA 38, ¶ 23, 440 P.3d 1256, 1262 (stating that the
 opening the door concept "isn't unlimited"). In
 other words, the opening's width must dictate how much
 the opposing party may pass through it.
 
 
          ¶46
 Here, the record reflects that the People didn't
 weaponize the door kicked open by the defense: The defense
 relentlessly pressed throughout the trial its claim that the
 children had been coached or otherwise improperly influenced
 by their grandmother, and the People responded through
 Grimm's opinion that she perceived no indicia of coaching
 during her interviews with the children.[4] More
 
 29
 
 importantly, the record bears out that the district court
 didn't abuse its discretion in permitting Grimm's
 challenged expert testimony, which was tightly confined in
 scope and did nothing to widen the door opened by the
 defense. See Coons, ¶ 41, 495 P.3d at 98
 (noting that we review a trial court's admission of
 expert testimony for an abuse of discretion). Appellate
 courts reviewing for an abuse of discretion reverse only when
 the disputed decision "is manifestly erroneous."
 Id. (quoting People v. Rector, 248 P.3d
 1196, 1200 (Colo. 2011)). This highly deferential standard
 keeps an appellate court from second-guessing the trial
 court's on-the-ground judgment. Cooper, ¶
 93, 496 P.3d at 447. With no manifest error in sight in this
 case, we have no basis to climb down from the appellate perch
 and intrude upon the district court's domain. Instead,
 our review ends where the district court's exercise of
 sound discretion began.
 
 
          III.
 Conclusion
 
 
          ¶47
 For the foregoing reasons, we affirm the division's
 judgment. We remand the case to the division with
 instructions to return it to the district court.
 
 30
 
           CHIEF
 JUSTICE MARQUEZ, joined by JUSTICE BOATRIGHT and JUSTICE
 BLANCO, dissenting.
 
 
          ¶48
 Today the majority relies on the "opening the door"
 doctrine to justify the admission of otherwise inadmissible
 expert opinion testimony on the credibility of child
 witnesses. It does so in a child sexual assault case, the
 very kind of case that frequently hinges on credibility. In
 so doing, it holds for the first time that a defendant
 "opens the door" to such inadmissible (and unfairly
 prejudicial) evidence merely by pursuing a garden-variety
 "coaching" theory of defense that challenges the
 credibility of the allegations against the defendant. Here,
 the majority does not identify specific testimony introduced
 by the defense that would require additional context to
 correct an objectively misleading impression. Instead, it
 holds for the first time that a defendant "opens the
 door" to the introduction of otherwise inadmissible
 expert vouching testimony simply by pursuing a theory of
 defense-through voir dire and opening statements (neither of
 which are evidence), and even closing arguments (which are
 not only not evidence, but which somehow contribute to
 "opening the door" after the close of evidence). In
 short, the majority takes an already confusing and amorphous
 doctrine and stretches it beyond recognition.
 
 
          ¶49
 The majority assumes, without deciding, that the expert's
 testimony was inadmissible. Maj. op. ¶ 6. But this issue
 should be decided outright. As Judge
 
 31
 
 Schutz explained, the testimony at issue here was
 inadmissible because there is no principled distinction
 between testimony that a child "was not coached"
 and testimony that a child "was being truthful."
 People v. Lopez, 2024 COA 26, ¶ 60, 550 P.3d
 731, 741 (Schutz, J., dissenting). In other words, the
 expert's testimony in this case was impermissible
 vouching. See People v. Eppens, 979 P.2d 14, 17-19
 (Colo. 1999).
 
 
          ¶50
 Equally importantly, the opening the door doctrine is
 inapplicable here. As I explain below, the doctrine comes
 into play only when one party (1) introduces testimony that
 (absent correction or additional context) creates an
 objectively misleading inference for the jury and (2)
 prevents the opposing party from explaining or rebutting that
 objectively misleading inference. Because Gustavo Lopez did
 neither in this case simply by pursuing his theory of
 defense, the doctrine does not apply. In any event,
 permitting expert opinion testimony regarding the child
 victims' truthfulness on specific occasions is a
 disproportionate response that injects unfair prejudice,
 particularly in a case such as this that hinges on
 credibility. The majority distorts the doctrine by applying
 it here, and in so doing, it effectively deters future
 defendants from pursuing a defense that a victim was coached
 into making false allegations.
 
 
          ¶51
 For the foregoing reasons, I respectfully dissent.
 
 32
 
          I.
 The Expert's Testimony Was Inadmissible Because It
 Concerned Specific Instances of the Children's
 Truthfulness
 
 
          ¶52
 "In Colorado, neither lay nor expert witnesses may give
 opinion testimony that another witness was telling the truth
 on a specific occasion." People v. Wittrein,
 221 P.3d 1076, 1081 (Colo. 2009). Testimony that another
 witness told the truth amounts to a credibility
 determination, which is a matter "solely within the
 jury's province." People v. Baker, 2021 CO
 29, ¶ 2, 485 P.3d 1100, 1102; see also Venalonzo v.
 People, 2017 CO 9, ¶ 32, 388 P.3d 868, 877
 ("The danger in admitting such testimony lies in the
 possibility that it will improperly invade the province of
 the factfinder.").
 
 
          ¶53
 "Testimony that another witness is credible is
 especially problematic where the outcome of the case turns on
 that witness's credibility," a situation that often
 arises in child sexual assault cases. Venalonzo,
 ¶ 33, 388 P.3d at 877 (emphasis added). A child's
 testimony as to abuse has an outsized importance because
 children may delay reporting sexual abuse, so collecting
 physical evidence becomes difficult or impossible.
 Id., 388 P.3d at 878. This means that the
 child's testimony becomes the most significant evidence
 in the case. Id.
 
 
          ¶54
 Here, the majority acknowledges that "it is clear that
 an expert witness may not directly vouch for the
 credibility of a child victim by opining that the child told
 the truth on a particular occasion." Maj. op. ¶ 25.
 Yet that is exactly what
 
 33
 
 happened here: By testifying that the children were not
 coached in a case that turned on their credibility, the
 expert directly vouched for their credibility. That is, the
 expert's testimony was inadmissible because it concerned
 specific instances of the children's truthfulness.
 See Eppens, 979 P.2d at 17 ("It is well
 established that CRE 608(a)(1) does not permit a witness to
 offer an opinion that a child was telling the truth on the
 specific occasion that the child reported a particular sexual
 assault by a defendant.").
 
 
          ¶55
 Our precedent on direct vouching leads to this inescapable
 conclusion. Four decades ago, in Tevlin v. People,
 715 P.2d 338, 339 (Colo. 1986), we considered the testimony
 of an expert in child abuse investigation. The expert formed
 an opinion as to whether "the victim gave truthful
 information based on the interviews [the expert] conducted
 with the victim and his stepbrother" and then
 "testified that he believed the victim was telling the
 truth about the fact that he was beaten by the petitioner
 with the belt." Id. at 340. We held that the
 expert's testimony ran afoul of CRE 608 because it went
 to the victim's truthfulness on a specific
 occasion-directly vouching for the child's credibility.
 Id. at 341; see also People v. Oliver, 745
 P.2d 222, 225 & n.2 (Colo. 1987) (holding that expert
 witness and lay witness testimony that "they personally
 believed each of the three victims, based upon their
 experience and interviews of the victims" violated CRE
 608(a)).
 
 34
 
          ¶56
 We subsequently held that testimony analogous to saying a
 witness told the "truth" can likewise run afoul of
 CRE 608(a). Eppens, 979 P.2d at 18. In
 Eppens, for example, we held that a social
 worker's lay testimony that she "felt [the victim]
 was sincere" was "tantamount to a statement that
 she found [the victim] to be truthful." Id. at
 17-18. We found it particularly instructive that
 "sincerity" was "virtually synonymous
 with," and contained within, the definition of
 "truth." Id. at 18 (citing Truth,
 Webster's Third New International Dictionary, Unabridged
 (1986), which defined "truth" as "sincerity in
 character, action, and speech").
 
 
          ¶57
 Here, the expert testified about coaching, a concept
 inextricably linked with truthfulness. She explained to the
 jury that coaching is "when someone is telling the child
 to say that didn't happen when it really did or they may
 be telling the child to say something happened that actually
 did not." In other words, the expert explained to the
 jury that "coaching" occurs when a child is told to
 share an untruthful version of events-i.e., to lie. The
 expert here also testified that she was trained to look for
 signs of coaching. Critically, she then testified that, in
 her expert opinion, she did not feel like she saw "huge
 red flags" or "anything that indicated" the
 children were coached because both were "able to provide
 very specific experience-based details around the
 events" they described to her.
 
 
          ¶58
 The expert's own explanation of "coaching" made
 clear to the jury that signs of coaching indicate
 untruthfulness. By testifying that she did not see anything
 
 35
 
 that indicated coaching, the expert effectively testified
 that the children were not lying when they accused Lopez of
 sexual assault. Put simply, the expert directly vouched for
 the children's credibility. As the division correctly
 explained,
 
 
 [A]n expert witness may not opine that a child was not
 coached in making allegations, or-because it amounts to the
 same thing-that the expert did not see signs of coaching.
 Coaching testimony is impermissible because it
 "constitute[s] conclusions about [the children's]
 truthfulness in their respective interviews," and is
 "tantamount to vouching for the child[ren]'s
 credibility."
 
 
 Lopez, ¶ 12, 550 P.3d at 734 (alterations in
 original) (citations omitted) (first quoting People v.
 Bridges, 2014 COA 65, ¶ 16, 410 P.3d 512, 514; and
 then quoting People v. Heredia-Cobos, 2017 COA 130,
 ¶ 14, 415 P.3d 860, 864).
 
 
          ¶59
 Where, as in this case, an expert who is qualified in child
 forensic interviewing and trained to detect coaching in
 children testifies that a child was not coached to make
 accusations, "the jury's only conceivable use of
 such testimony would be as support for the complainant's
 truthful character." People v. Snook, 745 P.2d
 647, 649 (Colo. 1987). Because the expert directly vouched
 for the children's credibility, her testimony was
 inadmissible under CRE 608(a).
 
 
          II.
 The Defense Did Not "Open the Door"
 
 
          ¶60
 Having concluded that the expert's testimony is
 inadmissible, I now turn to the question of whether the
 defense nevertheless "opened the door" to the
 testimony by pursuing a theory of defense that the children
 were coached into making false allegations. Precisely because
 the theory of defense did not create an
 
 36
 
 objectively misleading impression or give the defense an
 unfair advantage, the doctrine is inapplicable here. In any
 event, permitting the prosecution to introduce an expert
 opinion on credibility invaded the province of the jury and
 injected unfair prejudice into the case. The majority's
 holding to the contrary distorts the doctrine beyond
 recognition and effectively deters future defendants from
 pursuing such a defense.
 
 
          A.
 The Theory of Defense Did Not Create an Objectively
 Misleading Impression or Give the Defense an Unfair
 Advantage
 
 
          ¶61
 "The concept of 'opening the door,' not codified
 in our rules of evidence, is a court-promulgated curative
 measure that is not easily defined." People v.
 Melillo, 25 P.3d 769, 775 (Colo. 2001). We have
 conceptualized it as "an effort by courts to prevent one
 party from gaining an unfair advantage by presenting evidence
 that, without being placed in context, creates an incorrect
 or misleading impression." Id.
 
 
          ¶62
 The purpose of the doctrine in Colorado is to prevent one
 side from raising an objectively misleading adverse inference
 while simultaneously preventing the other side from
 explaining or rebutting that inference. See People v.
 Miller, 890 P.2d 84, 98-99 (Colo. 1995). Accordingly,
 the doctrine does not apply unless both of those conditions
 are present. Because pursuing a defense theory that a victim
 was coached does not, in and of itself, raise an objectively
 misleading adverse
 
 37
 
 inference, and because the prosecution in this case was not
 prevented from explaining or rebutting the defense's
 theory, the opening the door doctrine is inapplicable here.
 
 
          ¶63
 The origin of the doctrine in Colorado is difficult to
 pinpoint, but several early cases outline its foundation. It
 began as a form of impeachment. For example, in Medina v.
 People, 291 P.2d 1061, 1062 (Colo. 1956), we held that a
 defendant "opened the door" to the question of
 whether he had ever owned a pistol by testifying that he had
 not. To contradict the defendant's (objectively
 misleading) testimony, the prosecution introduced rebuttal
 testimony that the defendant had been arrested with a pistol
 some years earlier. Id. We held that the defendant
 "opened the door" to the question of gun ownership,
 and that a party may always "present evidence to
 challenge the credibility of an adverse witness by proof of
 independent facts and circumstances inconsistent with his or
 her testimony." Id.; see also
 People v. Cole, 654 P.2d 830, 834 (Colo. 1982)
 (holding that the defendant's testimony about not using a
 knife in a prior fight "opened the door to the issue of
 the prior fight" and that "the prosecution was
 entitled to introduce competent evidence to explain, refute,
 or disprove the statement, since the defendant's
 credibility was in issue").
 
 
          ¶64
 We later relied on the doctrine to permit the use of
 otherwise restricted (and therefore inadmissible) testimony
 to contradict an objectively misleading
 
 38
 
 inference raised by an opponent. In People v.
 Tenorio, 590 P.2d 952, 957 (Colo. 1979), for example,
 officers were permitted to testify on direct examination that
 they received a call involving a man of the defendant's
 description, but not that he was reported to be drunk and
 brandishing a weapon. On cross-examination, however, defense
 counsel elicited testimony from an officer that he had his
 gun drawn and pointed at the defendant as he first
 approached. Id. at 958. On re-direct examination,
 the prosecution asked the officer why his gun was drawn, and
 the officer explained that the defendant was reported to have
 a weapon. Id. We held that the defense's
 cross-examination "opened the door" to the
 restricted testimony because "[t]he district attorney
 had a right to explain or rebut any adverse inferences which
 might have resulted from that cross-examination
 question." Id. In other words, the otherwise
 restricted testimony was admissible because it tended to
 explain the objectively misleading adverse inference raised
 by the defense's cross-examination.
 
 
          ¶65
 Similarly, in People v. Sams, 685 P.2d 157, 164
 (Colo. 1984), we reiterated that a defendant may not raise an
 objectively misleading adverse inference while simultaneously
 preventing the prosecution from explaining or rebutting that
 inference. See id. at 158, 164 (explaining that the
 proper remedy for the prosecution's loss of exculpatory
 identification evidence was suppression of all identification
 evidence, and allowing the defense to inquire into suppressed
 
 39
 
 identifications on cross-examination but warning that doing
 so would "open[] the door" for the prosecution to
 elicit additional testimony about the same).
 
 
          ¶66
 Over a decade later, we applied the doctrine to allow the
 introduction of other crimes evidence otherwise barred by CRE
 404(a). Miller, 890 P.2d at 96, 99. In
 Miller, the defendant was charged with possession
 and distribution of cocaine; a prosecution witness testified
 that he made two substantial purchases of cocaine from the
 defendant on the charged date. Id. at 87-88, 99. On
 cross-examination, the defense adduced testimony that
 suggested the prosecution witness's relationship with the
 defendant was entirely casual and lawful before the charged
 date, and that the two men knew each other only informally.
 Id. at 88, 97-99. On re-direct examination, the
 prosecution elicited testimony clarifying that the
 prosecution witness had bought cocaine from the defendant
 "quite a few" times even before the charged date.
 Id. at 88-90, 97. We held that the defense
 "open[ed] the door" to evidence of the
 defendant's other crimes by seeking "to exclude the
 inadmissible evidence that would place that relationship in
 its proper context, revealing the true nature and scope of
 the friendship." Id. at 99. We thereby
 reiterated that the defendant could not selectively present
 facts that created a factually incorrect or misleading
 impression while simultaneously preventing the prosecution
 from explaining or providing context to correct the
 misimpression created by the defense.
 
 40
 
          ¶67
 Thus, in Miller, we articulated for the first time the rule
 for "opening the door" as we use it today:
 "This concept of 'opening the door' represents
 an effort by courts to prevent one party in a criminal trial
 from gaining and maintaining an unfair advantage by the
 selective presentation of facts that, without being
 elaborated or placed in context, create an incorrect or
 misleading impression." Id. at 98-99 (emphases
 added) (first citing Sams, 685 P.2d at 164; and then
 citing Tenorio, 590 P.2d at 958).
 
 
          ¶68
 In concluding that the defense "opened the door" in
 this case, the majority relies on Golob v. People,
 180 P.3d 1006 (Colo. 2008). Maj. op. ¶ 32. But
 Golob rested on the same principles advanced in
 Tenorio, Sams, and Miller.[5] In
 Golob, the prosecution elicited testimony from its
 expert witness that characterized the defense expert's
 findings as consistent with his own findings. 180 P.3d at
 1012. When the defense expert attempted to disagree, the
 prosecution objected, and the trial court excluded the
 defense expert's testimony. Id. at 1009, 1012.
 We held that
 
 41
 
 the prosecution "opened the door" to the defense
 expert's testimony because, otherwise, the prosecution
 expert's testimony stood unchallenged and "resulted
 in an unfair advantage to the prosecution through the
 selective presentation of expert opinion to the jury on this
 important evidence." Id. at 1012-13.
 
 
          ¶69
 The principle we followed in Golob, though applied
 in a new context, was nothing new: A party may not mislead
 the jury into believing objectively untrue facts. In
 Tenorio, for example, the concern was that the jury
 might have believed that the police officer drew and pointed
 his gun at the defendant for no reason, when in fact, the
 defendant reportedly had a weapon. See Tenorio, 590
 P.2d at 958. In Miller, the concern was that the jury might
 have found it unlikely that the defendant would suddenly sell
 substantial quantities of cocaine to a person he knew only
 casually, when in fact, the defendant had sold cocaine to him
 several times before. See Miller, 890 P.2d at 99. And in
 Golob, the concern was that the jury might have
 believed that the defense expert's report aligned with
 the prosecution expert's report, when in fact, the
 defense expert disagreed with that characterization. See
 Golob, 180 P.3d at 1012-13.
 
 
          ¶70
 Here, however, nothing about the theory of defense misled the
 jury to believe objectively untrue facts. It is the
 jury's role as factfinder to assess the credibility of
 witnesses at trial. As is often the situation in child sexual
 assault cases, the defense theory challenged the allegations
 against Lopez by focusing on
 
 42
 
 the children's credibility. The majority admits as much.
 Maj. op. ¶ 6 ("By consistently attacking the
 credibility of the children with assertions that they had
 been coached, the defense opened the door ...."
 (emphasis added)). Unlike the objectively misleading
 testimony animating this court's concerns in
 Tenorio, Miller, and Golob, the
 children's credibility in this case was a core issue for
 the jury to decide. In exercising its crucial role as
 factfinder, the jury might have believed the children's
 allegations, or it might have believed that the grandmother
 coached or otherwise improperly influenced the children
 because she wanted to maintain custody of them. Indeed,
 several aspects of the case arguably undermined the
 children's credibility: They initially denied the
 allegations, their forensic interviews were delayed, their
 testimony contained inconsistencies, there was no physical
 evidence of either incident, and they had an incentive to
 make up allegations against Lopez because they wanted to live
 with their grandmother. I also find it especially troubling
 that the majority treats the theory of defense in this case
 as presenting a "misleading impression."
 Id. at ¶ 42. I do not see how a garden-variety
 theory of defense centered on challenging the credibility of
 the allegations against the defendant constitutes
 "getting the upper hand at trial by selectively
 presenting facts." Id. at ¶ 29.
 
 
          ¶71
 Importantly, the defense did not prevent the prosecution from
 explaining or rebutting the coaching theory. After the
 defense engaged in lines of questioning
 
 43
 
 on cross-examination to suggest that the children were
 coached, the prosecution could, and did, rebut those
 suggestions on re-direct examination. As just one example,
 the defense elicited testimony from the grandmother on
 cross-examination that she did not report the incidents to
 Social Services until after the children's mother tried
 to regain custody-suggesting that the grandmother fabricated
 the allegations to maintain custody of the children. But on
 re-direct examination, the prosecution (appropriately)
 elicited testimony that the grandmother did not report the
 incidents because she thought Social Services already knew.
 Because the theory of defense in this case did not create an
 objectively misleading adverse inference that could be
 corrected only by the introduction of otherwise inadmissible
 vouching testimony, the opening the door doctrine does not
 apply.
 
 
          B.
 Permitting the Expert's Testimony Injected Unfair
 Prejudice
 
 
          ¶72
 Even if a party "opens the door" to inadmissible
 evidence, not all inadmissible evidence may come in. As the
 majority acknowledges, id. at ¶¶ 44-45,
 the doctrine allows inadmissible evidence only to the extent
 necessary to remove any unfair prejudice, i.e., by correcting
 an objectively misleading impression. Permitting the
 prosecution to present an expert opinion on a child
 witness's credibility exceeds these limits and instead
 injects unfair prejudice into the case.
 
 44
 
          ¶73
 Experts are, and should be, permitted to educate jurors about
 typical behaviors of children who have been sexually
 assaulted. People v. Fasy, 829 P.2d 1314, 1317
 (Colo. 1992) (holding that expert testimony was admissible
 where the expert testified that child sexual assault victims
 can suffer posttraumatic stress disorder and that the child
 victim suffered posttraumatic stress disorder). However,
 experts are not permitted to testify that a child was telling
 the truth about having been sexually assaulted. People v.
 Gaffney, 769 P.2d 1081, 1088 (Colo. 1989) (holding that
 expert testimony was inadmissible where the expert testified
 that the child's description of the events was "very
 believable"); see also Snook, 745 P.2d at 648-49
 (holding that expert testimony was inadmissible where the
 expert testified that children tend not to fabricate erotic
 experiences).
 
 
          ¶74
 To the extent the expert's testimony in this case helped
 the jury to understand the concept of coaching and described
 the signs of coaching, it was proper. For example, the expert
 testified,
 
 
 [I]f a child is being coached, it is more difficult for them
 to describe all the details of what they can hear, what the
 room looked like, meaning what the clothing looked like that
 they were wearing, exactly what was said or how they felt in
 that situation. When a child is coached, it is typically
 difficult for them to recall that information because in
 coaching a lot of times people aren't telling the child
 to say all of these things as well.
 
 45
 
          It
 would have been entirely proper for the jury to take that
 expert's explanation and apply it to the evidence in the
 case, such as the children's video recorded interviews.
 But it was entirely improper for the expert to do the
 jury's work for it.
 
 
          ¶75
 As Judge Schutz explained, jurors often feel saddled with the
 heavy responsibility of determining witnesses'
 credibility. Lopez, ¶ 60, 550 P.3d at 741 (Schutz, J.,
 dissenting). This responsibility can feel particularly heavy
 in child sexual assault cases, "which are emotionally
 charged and present serious consequences for both the
 defendant and the alleged victims." Id.
 "Facing such pressures, there is a real risk that jurors
 may displace their burden to assess credibility by deferring
 to the opinion of a purported expert." Id.
 Those dangers are precisely why expert testimony about a
 witness's credibility is prohibited.
 
 
          ¶76
 Notably, the prosecution specifically requested in a motion
 in limine that all witnesses be precluded from commenting on
 other witnesses' veracity, and it avoided asking the
 expert to opine directly on the children's truthfulness.
 Instead, the expert's testimony vouching for the
 children's credibility was elicited by a question from a
 juror after the prosecution completed its re-direct
 examination.
 
 
          ¶77
 Permitting the expert to answer the juror's question was
 manifestly improper because it was inadmissible vouching
 testimony that was wholly unnecessary: The expert's
 testimony (and other evidence) in the case did not create
 
 46
 
 an objectively misleading impression that required
 correction. As such, allowing the expert to answer the
 juror's question was a clear abuse of discretion.
 
 
          ¶78
 The majority asserts that the expert's testimony merely
 "supplied the context necessary to complete the picture
 the defense had painted." Maj. op. ¶ 43. But the
 expert in this case did more than supply "context":
 She directly vouched for the children's credibility by
 effectively testifying that they told the truth when they
 accused the defendant of sexual assault. Such testimony was
 tantamount to an expert opinion on the children's
 credibility.
 
 
          ¶79
 Vouching testimony is uniquely harmful because it directly
 usurps the role of the jury. Baker, ¶¶ 2,
 45, 485 P.3d at 1102, 1109. As we have explained,
 "[t]estimony that another witness is credible is
 especially problematic where the outcome of the case turns on
 that witness's credibility," and "[t]his often
 occurs in child sex assault cases." Venalonzo,
 ¶ 33, 388 P.3d at 877. When a child delays reporting
 sexual abuse, collecting physical evidence may be difficult
 or impossible, and the child's testimony will likely be
 the most significant evidence in the case. Id., 388
 P.3d at 878. Because the case will turn on whether the jury
 finds the child credible, "courts must be particularly
 mindful of testimony that a child victim is telling the truth
 when that child's testimony is 'the focal issue in
 the case.'" Id. (quoting Snook,
 745 P.2d at 649).
 
 47
 
          ¶80
 The opening the door doctrine "'can be used only to
 prevent prejudice; it can't be used as an excuse to
 inject prejudice into the case.'" People v.
 Ray, 2025 CO 42M, ¶ 86, 575 P.3d 400, 427-28
 (emphases added) (quoting People v. Cohen, 2019 COA
 38, ¶ 23, 440 P.3d 1256, 1262-63). The doctrine
 "isn't unlimited and 'inadmissible rebuttal
 evidence "is permitted 'only to the extent necessary
 to remove any unfair prejudice which might otherwise have
 ensued from the original evidence.'"'"
 Id., 575 P.3d at 427 (quoting Cohen, ¶ 23, 440
 P.3d at 1262).
 
 
          ¶81
 In this case, there was no physical evidence, and the
 children's forensic interviews were delayed. The
 children's testimony was therefore the most significant
 evidence, and the case turned on whether the jury found the
 children credible. Permitting an expert to vouch for the
 children's credibility was thus inherently unfairly
 prejudicial because it usurped the jury's role in
 determining a key disputed issue in the case. See People
 v. Kembel, 2023 CO 5, ¶ 53, 524 P.3d 18, 29
 (explaining that unfairly prejudicial evidence has an
 "adverse effect upon a defendant beyond tending to prove
 the fact or issue that justified its admission into
 evidence" (quoting United States v. Gilliam,
 994 F.2d 97, 100 (2d Cir. 1993))); People v. Dist.
 Ct., 785 P.2d 141, 147 (Colo. 1990) (defining unfairly
 prejudicial evidence as having "an undue tendency to
 suggest a decision on an improper basis").
 
 48
 
          C.
 The Majority Significantly Expands the Boundaries of the
 Doctrine
 
 
          ¶82
 Importantly, the majority's holding today significantly
 expands the use of the opening the door doctrine by applying
 it for the first time to a theory of defense.
 
 
          ¶83
 The majority reasons that Lopez's theory of defense at
 trial "opened the door" by "repeatedly
 suggesting to the jury" that the children were coached
 and weaving "this theme throughout the trial, from the
 initial ripple to the final wave-introducing it in voir dire,
 incorporating it into the opening-statement roadmap,
 reinforcing it through witness examinations and testimony,
 and hammering it home in closing arguments." Maj. op.
 ¶¶ 10, 32.
 
 
          ¶84
 We have never considered counsel's comments made during
 voir dire, opening statements, and closing
 arguments[6]-none of which are evidence-to "open
 the door" to the introduction of otherwise inadmissible
 evidence, and we should decline to do so here. Pernell v.
 People, 2018 CO 13, ¶¶ 4, 24, 411 P.3d 669,
 670, 673 (declining to address whether an opening statement
 "opened the door" to inadmissible evidence);
 see also Davis v. People, 2013 CO 57, ¶¶
 2, 12, 310 P.3d 58, 59, 61.
 
 49
 
          ¶85
 In Medina, we held that the prosecution could contradict the
 defendant's testimony with lay testimony on rebuttal. 291
 P.2d at 1062. In Tenorio, Sams, and Miller,
 we held that the prosecution could contradict the
 defense's cross-examination with further questioning on
 re-direct.[7] Tenorio, 590 P.2d at 957-58;
 Sams, 685 P.2d at 164; Miller, 890 P.2d at 99. And
 in Golob, we held that the defense could contradict
 the prosecution's expert testimony with its own expert
 testimony. 180 P.3d at 1012-13.
 
 
          ¶86
 But "[o]pening statements are not evidence, and they do
 not constrain later argument or introduction of
 evidence." Davis, ¶ 33, 310 P.3d at 65-66
 (Bender, C.J., concurring in the judgment) ("What is
 inappropriate, however, is permitting opposing counsel to
 present irrelevant or otherwise inadmissible evidence on the
 basis that an opening statement, which carries no evidentiary
 weight, opened the door to its admission."). The
 majority's holding in this case stands not only for the
 remarkable proposition that a defendant may "open the
 door" to expert testimony that a victim was truthful but
 also that a defendant may "open the door" to such
 otherwise inadmissible evidence merely by pursuing a theory
 of defense "that the [victim] had been coached or
 otherwise improperly influenced." Maj. op. ¶ 44.
 
 50
 
          ¶87
 I am deeply concerned about the implications of the
 majority's holding on future, similarly situated
 defendants. Coaching is a common defense to allegations of
 sexual assault on a child, and the majority's decision
 today undercuts any such defense. A defendant who seeks to
 defend against allegations of sexual assault on a child by
 explaining that a third party improperly induced the
 child's outcry may now anticipate the introduction of
 expert testimony vouching for the child's truthfulness.
 Indeed, going forward, defendants must be careful not to even
 suggest that a child victim might be told what to say-not in
 voir dire, opening statement, or closing argument-lest they
 "open the door" to expert testimony that the child
 told the truth. I cannot support this result.
 
 
          III.
 Conclusion
 
 
          ¶88
 By applying the opening the door doctrine to this case, the
 majority distorts it beyond recognition. Nothing about
 Lopez's theory of defense created an objectively
 misleading impression or gave the defense an unfair
 advantage. And in any event, permitting an expert to directly
 vouch for the victims' credibility was a disproportionate
 response that injected unfair prejudice into a case that
 hinged on credibility.
 
 
          ¶89
 For the foregoing reasons, I respectfully dissent.
 
 
 ---------
 
 
 Notes:
 
 
 [1] We are aware that in common parlance
 lawyers and judges often use "opening the door"
 imprecisely, including to permit admissible evidence to
 refute or rebut an argument or other evidence. See
 generally People v. Miller, 890 P.2d 84, 99 (Colo. 1995)
 (citing 21 Wright & Miller's Federal Practice &
 Procedure § 5039 (1977)), for the proposition that trial
 courts and appellate courts alike often create confusion by
 using terms like "opening the door," "fighting
 fire with fire," and "curative admissibility"
 in situations requiring analysis pursuant to the rules of
 evidence). In this opinion, when we refer to opening the
 door, we mean the doctrine that allows a party to present
 otherwise inadmissible evidence because the opposing party
 has selectively introduced information that leaves the
 factfinder with an inaccurate or misleading
 impression.
 
 
 [2] The question raised by Lopez reads as
 follows:
 
 
 Whether a criminal defendant can open the door to
 expert witness testimony that another witness told the truth
 on a particular occasion. This framing notwithstanding, as in
 Liggett v. People, 135 P.3d 725, 732 n.2 (Colo.
 2006), we abstain from addressing whether the opening the
 door doctrine may ever permit a witness to testify that
 another witness told the truth on a particular occasion. That
 issue is simply not implicated here. Indeed, the division
 refrained from tackling it. As the division aptly pointed
 out, Grimm did not testify that the children told the truth
 during their forensic interviews. Instead, she said that she
 didn't see any indication of coaching. "This court
 is not empowered to give advisory opinions based on
 hypothetical fact[ual] situations" posed by counsel.
 Tippett v. Johnson, 742 P.2d 314, 315 (Colo.
 1987).
 
 
 [3] Compare People v. Snook, 745
 P.2d 647, 648 (Colo. 1987) (analyzing the admissibility of
 the challenged expert testimony under CRE 608(a), not CRE
 702, and disagreeing with the People that (1) expert
 "opinion evidence that merely corroborates a particular
 person's version of the offense" without directly
 vouching for the person's character for truthfulness
 falls outside the scope of CRE 608(a)'s prohibition, and
 (2) no abuse of discretion occurred because the expert
 testimony did not "explicitly" corroborate the
 child victim's credibility); People v. Wittrein,
 221 P.3d 1076, 1081-82 (Colo. 2009) (following Snook and
 applying CRE 608(a) without mentioning CRE 702); and
 Venalonzo, ¶¶ 32, 33, 388 P.3d at 877-78
 (adhering to Snook's CRE 608(a) analysis-without
 determining whether the testimony was expert opinion evidence
 subject to CRE 702-in rejecting the division's conclusion
 that the testimony that child victims commonly give
 conflicting details was proper rebuttal evidence in light of
 the defense's contention that the conflicting details
 were indicia of fabrication; and declaring that testimony
 with "direct and indirect implications [about] a
 child's truthfulness" wanders outside the
 evidentiary fence line) (emphasis added)); with People v.
 Gaffney, 769 P.2d 1081, 1086 (Colo. 1989) (explaining
 that CRE 608(a) doesn't preclude "all statements
 that may tend to support the credibility of a
 child-victim's out-of-court statements or in-trial
 testimony concerning a sexual crime," and acknowledging
 that CRE 702 permits expert testimony establishing that
 traits, characteristics, and/or behaviors exhibited by a
 child victim matched those found in other child victims of
 sexual abuse); People v. Fasy, 829 P.2d 1314,
 1317-19 (Colo. 1992) (upholding the admission of expert
 testimony that (1) the child victim's behaviors after the
 sexual assault aligned with those of children suffering from
 posttraumatic stress disorder, (2) the child victim suffered
 from that disorder, and (3) a sexual assault could have
 triggered the disorder; rejecting the defendant's
 reliance on CRE 608(a); and holding that the challenged
 expert testimony was admissible under CRE 702, in part
 because it helped the jury understand post-incident behaviors
 exhibited by the child victim, including the yearslong delay
 in reporting the sexual abuse, notwithstanding the fact that
 such testimony indirectly and incidentally bolstered the
 child victim's credibility); and People v.
 Cooper, 2021 CO 69, ¶ 97, 496 P.3d 430, 448
 (cautioning that generalized expert testimony isn't
 rendered inadmissible merely because it has an
 "incidental" bolstering effect on a domestic
 violence victim's credibility; and citing People v.
 Relaford, 2016 COA 99, ¶ 30, 409 P.3d 490, 496, for
 the proposition that "expert testimony generally tends
 to bolster or attack the credibility of another witness"
 (quoting People v. Koon, 724 P.2d 1367, 1370
 (Colo.App. 1986)).
 
 
 [4] Nothing in our opening the door
 jurisprudence fenced the People into a nonevidentiary
 response. Nor is there support in Colorado law for the notion
 that Lopez, as the party who swung the gate open, was
 entitled to stand in the doorway and dictate the form of the
 evidence the People properly carried across the
 threshold.
 
 
 [5] Golob did not directly cite
 to Tenorio, Sams, or Miller; it instead
 cited People v. Murphy, 919 P.2d 191, 195 (Colo.
 1996), which in turn cited Tenorio, Sams,
 and Miller. Golob, 180 P.3d at 1012. But
 Golob uses the same language as Miller to describe
 the opening the door doctrine. Compare Golob, 180
 P.3d at 1012 ("'[O]pening the door' represents
 an effort by courts to prevent one party in a criminal trial
 from gaining and maintaining an unfair advantage by the
 selective presentation of facts that, without being
 elaborated or placed in context, create an incorrect or
 misleading impression."), with Miller, 890 P.2d
 at 98-99 (same). Therefore, Golob rested on the same
 principles as those advanced in Tenorio, Sams, and
 Miller.
 
 
 [6] The majority does not explain how the
 defense's closing arguments, which obviously occurred
 after the close of evidence, contributed to "opening the
 door" to the expert's testimony here.
 
 
 [7] Even in Venalonzo, a more
 recent case applying the opening the door doctrine, we held
 that the prosecution could contradict the defense's
 cross-examination of a non-expert investigating
 officer with further questioning on re-direct examination.
 ¶ 44, 388 P.3d at 880.
 
 
 ---------